THELONIOUS PAIGE *v.* SAINT ANDREW'S ROMAN CATHOLIC CHURCH CORPORATION ET AL.
(SC 15866)

Callahan, C. J., and Berdon, Norcott, Palmer and McDonald, Js.

Argued May 29—officially released September 15, 1998*

*John B. Farley*, with whom was *Mark R. Cramer*, for the appellant (named defendant).

*Vincent M. Musto*, with whom was *Lillian C. Gustilo*, for the appellee (plaintiff).

*Opinion*

BERDON, J. The plaintiff, Thelonious Paige, sustained grievous injuries when a large boiler in the basement of a church owned by the defendant St. Andrew's Roman Catholic Church Corporation (defendant) was activated while the plaintiff was cleaning it from the inside.

As a result of the accident, which occurred on April 22, 1988, the plaintiff suffered third and fourth degree burns over two thirds of his body; portions of his legs and ankles were burned to the bone. Ten years later,

---

* Superseded. See *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 734 A.2d 85 (1999).

the plaintiff remains severely scarred. Following his injury, the plaintiff brought this negligence action against the defendant.[1] The case was tried before a jury, which returned a verdict in favor of the plaintiff. After reducing the amount of damages by 35 percent to account for contributory negligence, the jury awarded the plaintiff damages in the approximate amount of $3.2 million.[2]

The trial court thereafter denied the defendant's motion to set aside the jury's verdict and for judgment notwithstanding the verdict. The defendant appealed from this ruling to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

The defendant asserts three claims before this court: (1) the jury's verdict is not supported by sufficient evi-

[1] Initially, the plaintiff asserted claims against a number of parties. At the conclusion of the evidentiary portion of the trial, St. Andrew's Roman Catholic Church Corporation was the only remaining defendant. For this reason, references to the defendant are to St. Andrew's.

[2] The jury returned the following verdict:

"PLAINTIFF'S VERDICT

"In this case, the Jury finds that the comparative negligence of the plaintiff, if any, was not greater than the negligence of the defendant and finds the issues for the plaintiff against the defendant in accordance with the following calculations:

| | |
|---|---|
| "1. Economic Damages | $2,989,205.21 |
| "2. Noneconomic Damages | $1,903,832.00 |
| "3. Total: (Add lines 1 and 2) | $4,893,037.21 |
| "4. Percentage of plaintiff's negligence, if any | 35% |
| (If amount on line 4 is 0, enter amount from line 3 as verdict amount on line 6.) | |
| "5. If the plaintiff is found to be contributorily negligent, | |
| "a. Multiplication of #4 by #3 | $1,712,563.02 |
| "b. Subtraction of #5a from #3 | $3,180,474.19 |
| "6. Enter amount of verdict: | $3,180,474.19 |
| (If % on line 4 is 0, enter amount on line 3 as verdict. If more than 0, enter the amount from line 5b.) | Damages |

s/ Charles I. Mood
FOREPERSON"

dence; (2) the trial court improperly excluded evidence of subsequent remedial measures adopted by the plaintiff's employer, Turnpike Furnace Company (Turnpike Furnace); and (3) the trial court improperly declined to instruct the jury regarding the defendant's claim that the plaintiff was employed by an independent contractor. We review these claims seriatim.

## I

The defendant claims there was insufficient evidence to prove a causal connection between the jury's finding that it was negligent in "[f]ailing to supervise its employees, servants, and agents and failing to instruct them to avoid activating the burner or boiler while [the plaintiff] was cleaning the boiler" and the plaintiff's injuries.[3] We are persuaded to the contrary.

The jury reasonably could have found the following facts. The plaintiff and his coworker, on-site supervisor Osvaldo Cano, arrived at the defendant's church between 8:30 and 9 a.m. They spent some time cleaning the exterior of the boiler before the plaintiff entered it to clean the interior. The emergency switch and the three circuit breaker switches that activate the boiler were mounted on a wall in the boiler room located eight to ten feet from the boiler. All four switches were in the "off" position when the plaintiff entered the boiler.[4]

---

[3] Because we conclude that the jury reasonably could have concluded that the defendant's negligence in failing to properly supervise its employees was causally connected to the plaintiff's injuries, we do not address the defendant's claims with respect to the causal connection between the jury's other findings of negligence and the plaintiff's injuries.

In those other findings, made pursuant to interrogatories 1 (a) and (g), respectively, the jury concluded that the defendant was negligent in "[f]ailing to deactivate the boiler in which [the plaintiff] was injured," and that "[t]he defendant's custodian, in spite of assuring [the plaintiff] that the boiler and burner had been deactivated, failed to properly deactivate the boiler and burner."

[4] The plaintiff and Cano both testified to this fact. The vice president of Turnpike Furnace added that both of these men were "[v]ery good" workers

The plaintiff entered the boiler through one of its two small hatchways. Cano fed the large vacuum hose that was used to clean the interior through one of the hatchways. When the plaintiff was inside the boiler, Cano was looking straight ahead into the boiler to supervise him. Consequently, Cano was unable to observe if anyone entered the boiler room after the plaintiff entered the boiler and before the plaintiff was injured. In order to see the plaintiff, Cano had to look through the hatchway adjacent to the hatchway through which the enormously powerful and noisy vacuum hose passed; accordingly, he was unable to hear anybody enter the boiler room.

The boiler room in which the plaintiff was injured was part of the same complex containing the church, school, church hall and kitchen. The defendant's rectory and convent are, respectively, up a hill and across the street from this complex. The rectory is so close to the complex that a painter working in the church hall went to the rectory to call 911 after learning of the plaintiff's injuries.

The boiler in which the plaintiff was injured could not have ignited unless someone activated both the emergency switch *and* the three circuit breakers.[5] There would be a minimum of a fifteen second delay, if not longer, between the activation of the switches and the ignition of the burners. Consequently, the person who activated the switches would have had time to turn on the switches, leave the boiler room and return to another part of the church complex before the boiler's burner ignited.

---

aware of the company's policy requiring employees to ensure that all switches are off before they begin work on a boiler.

[5] Three witnesses, including an engineer and an expert in oil heating, testified that it was impossible to activate the boiler unless all of the requisite switches were turned on.

At least nineteen people were in or near the church complex on the morning of April 22, 1988: three priests, five nuns, a maintenance supervisor and two janitorial assistants, a housekeeper, a cook, and two secretaries (hereinafter, collectively referred to as the employees), in addition to the plaintiff, Cano and two painters painting the church hall pursuant to a contract with the defendant. The switches were not activated by the plaintiff, Cano, or the painters.[6] This leaves at least fifteen employees who could have activated the boiler.

It is useful to state at the outset and with clarity what, precisely, the defendant challenges as insufficient. The defendant does not dispute that it would have been impossible for its boiler to ignite unless someone activated separate controls for *both* an emergency switch *and* three circuit breakers. Nor does the defendant contest the fact that it failed to provide *any* supervision, instructions or warnings whatsoever to any of its employees that they were not to activate the boiler.[7] Moreover, the defendant concedes—as it must—that, if the jury reasonably could have concluded that an employee activated the boiler, the defendant's failure to instruct its employees not to activate the boiler was a proximate cause of the plaintiff's injuries. In other words, if the jury reasonably could have found that an employee activated the boiler, the defendant concedes negligence and causation, and therefore liability. Thus,

---

[6] The jury reasonably could have credited the unambiguous and unimpeached testimony of Cano that he did not activate the boiler. Moreover, the jury reasonably could have credited the unambiguous and unimpeached testimony of Carl A. Coletta, the head painter in the church hall, that he and his partner did not touch the emergency switch or circuit breaker switches. See *Lopez* v. *Price*, 145 Conn. 560, 564, 145 A.2d 127 (1958) (credibility determinations fall within traditional province of jury).

[7] John E. Gilmartin, the pastor at the church at which the accident occurred on April 22, 1988, testified that neither he nor anybody else employed by the defendant "warn[ed] people or [posted] signs or [took] any actions of that nature to tell people to stay away from the boiler room while the boilers were being cleaned."

as the defendant itself characterizes the issue, its challenge to the jury's verdict centers on whether there was "direct or circumstantial evidence sufficient to support an inference that an unidentified church employee, servant, or agent had anything to do with the alleged activation of [the boiler's] control switches."

More than half a century ago, this court observed that " '[w]e have consistently held that in a civil case proof of a material fact by inference from circumstantial evidence, alone, need not be so conclusive as to exclude every other hypothesis. . . . The decisive consideration is not whether the [fact so found] is consistent or inconsistent with [alternative] hypotheses but whether or not the inference upon which it is based was one which could have been *fairly and reasonably drawn* from the physical facts without the admixture of speculation or conjecture.' " (Citation omitted; emphasis added.) *Gleba* v. *New Britain*, 133 Conn. 85, 88, 48 A.2d 227 (1946).

This standard is deferential, and for good reason. "The concurrence of the judgments of the [trial] judge and the jury who saw the witnesses and heard the testimony is a powerful argument" for upholding the verdict. *Lopez* v. *Price*, 145 Conn. 560, 564, 145 A.2d 127 (1958); accord *Fink* v. *Golenbock*, 238 Conn. 183, 207–208, 680 A.2d 1243 (1996); *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 610, 662 A.2d 753 (1995); *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988). Furthermore, it is not the function of this court to "sit as the 'seventh juror' when we review the sufficiency of the evidence . . . rather, we must determine, *in the light most favorable to sustaining the verdict*, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Purzycki* v. *Fairfield*, 244 Conn. 101, 112–13, 708 A.2d 937 (1998).

In making this determination, "[t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, supra, 208. In other words, "[i]f the jury *could* reasonably have reached its conclusion, the verdict must stand," even if this court disagrees with it. (Emphasis added.) *Donner* v. *Kearse*, 234 Conn. 660, 681, 662 A.2d 1269 (1995); see *Trzcinski* v. *Richey*, 190 Conn. 285, 298, 460 A.2d 1269 (1983).

Three further points bear emphasis. First, it is fundamental that, in a civil case, the plaintiff is not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient.[8] Second, jurors "are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand . . . ." (Internal quotation marks omitted.) *Purzycki* v. *Fairfield*, supra, 244 Conn. 113. Third, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury. Id., 112.

Although this is a close case, our independent review of the trial testimony reveals that neither speculation nor conjecture is required to justify the verdict rendered. Instead, the record reflects that the jury reasonably could have believed, "drawing proper inferences from [these] facts . . . that it was more probable than not that" one of the defendant's employees activated the boiler in which the plaintiff was working. *Blados*

---

[8] The plaintiff in a civil case "sustain[s] his burden of proof as to any essential element in his cause of action if the evidence, considered fairly and impartially, induce[s] in the mind of the trier a reasonable belief that it [is] more probable than otherwise that the facts involved in that element [are] true." *Busker* v. *United Illuminating Co.*, 156 Conn. 456, 458, 242 A.2d 708 (1968).

v. *Blados*, 151 Conn. 391, 396, 198 A.2d 213 (1964). We, therefore, decline the defendant's invitation to take the drastic measure of setting aside the work of the jury in this case.

The jury's determination is supported by focusing upon two consecutive and interrelated inquiries: (1) Who possessed the ability to activate the boiler? and (2) Of those people, who possessed the incentive to do so? We conclude that the jury reasonably could have determined that only the employees possessed sufficient ability to activate the boiler, and that they also possessed ample incentive to do so.

First, it is apparent that employees of the defendant possessed the ability to activate the boiler. At least fifteen employees were within easy walking distance of the boiler room; some of them would not even have had to exit the building in which they worked in order to do so.[9] Moreover, the jury reasonably could have concluded that several of these employees knew both where the boiler room was located and how to activate the boiler.[10]

Second, it is equally apparent that those employees possessed ample incentive to ignite the boiler. On the

---

[9] It is true, as the Chief Justice argues in his dissenting opinion, that there was no direct evidence to show that an employee of the defendant was in the complex at or near the time of the plaintiff's accident. Nevertheless, the jury did not need direct evidence of this fact to link the defendant to the activation of the boiler switches. "[T]riers of fact must often rely on circumstantial evidence and draw inferences from it. . . . There is no rule of law which forbids the resting of an inference on facts whose determination is the result of other inferences." (Citation omitted.) *Blados* v. *Blados*, supra, 151 Conn. 395.

[10] Clearly, the three priests who worked for the defendant at the time of the accident—each of whom possessed keys to the boiler room—knew where to find the boiler and how to activate it. In addition, although the jury found in its answer to an interrogatory that the maintenance supervisor did not activate the boiler, there were two janitorial assistants who could have activated it.

morning of April 22, 1988, the weather was between ten and twenty degrees above freezing. On the basis of this evidence, the jury could have concluded that one of the employees working in the complex served by the boiler was uncomfortably cold and that he or she activated the boiler in order to heat the building. In addition, a mass was scheduled at the church for 12:10 p.m. on April 22. The jury could have found that an employee wanted to make the church comfortable for parishioners, and that, because the church requires a sufficient length of time to warm up, it was necessary for the employee to activate the boiler approximately one hour prior to the commencement of the mass.

In addition, the jury reasonably could have concluded that an employee could have activated the relevant switches without appreciating the grave consequences of that act. First, it was not apparent from the outside of the boiler that the plaintiff was working inside. More importantly, the boiler room contained two separate boilers. Although all of the circuit breakers were marked and labeled, the labels were ambiguous: the boiler in which the plaintiff was injured was *further* from the door than the other boiler, yet the controls that activated it were labeled "boiler number one." Accordingly, the jury reasonably could have concluded that the person who ignited the boiler in which the plaintiff was injured did so in the mistaken belief that he or she was activating the *other* boiler—the one closer to the door.

On appeal, the defendant posits a number of exculpatory speculations, which it denominates "plausible hypotheses." Although they may be plausible, they do not preclude the jury from reasonably having found that the person who ignited the boiler was, more probably than not, an employee of the defendant.[11] See *Duley*

---

[11] Contrary to Chief Justice Callahan's suggestion in his dissenting opinion, the testimony of John E. Gilmartin, the pastor at the church, that he did

v. *Plourde,* 170 Conn. 482, 486, 365 A.2d 1148 (1976) (" '[p]roof of a material fact by inference need not be so conclusive as to exclude every other hypothesis' "). In other words, the jury reasonably could have concluded that only persons employed by the defendant possessed the ability and incentive to ignite the boiler.

The only other individuals who could have activated the boiler fall into two categories: parishioners and strangers off the street. There is no evidence that indicates that either a parishioner or a stranger was anywhere near the defendant's boiler room at the time the boiler was activated.

John E. Gilmartin, the pastor at the church, testified that all the parishioners who attended the 7 a.m. mass left shortly after it ended at 7:25, and there was no evidence that any parishioner arrived early for the 12:10 mass. Moreover, in order to activate the boiler at or near 11 a.m., the approximate time the accident occurred, a parishioner would have had to either linger for more than *three hours* after the morning mass had ended or arrive approximately *one hour* before the 12:10 mass began. At trial, the defendant was unable to account for any parishioner's presence in the church during either of these intervals. For these reasons, the jury reasonably could have concluded that no parishioners were inside the church at the time the boiler ignited.

Even if a parishioner had been in the church for some reason at the requisite time, no evidence was presented to support the defendant's assumption that someone

not observe anyone associated with the school in the church hall at either 7:25 or 9:30 a.m, did not preclude the jury from inferring that other employees were present in the church complex at or near 11 a.m., the approximate time of the accident. Indeed, Gilmartin testified that, because he merely walked through the church hall on those two discrete occasions, he did not know whether anyone was present in the school, kitchen or church before the accident occurred.

not employed by the defendant[12] was permitted to enter the boiler room, knew where the boiler room was, or knew how to activate an industrial boiler. Thus, the jury reasonably could have concluded that it was less probable than not that a parishioner ignited the boiler.

The highly speculative nature of this string of suppositions increases geometrically when applied to strangers off the street. Again, the defendant has introduced no evidence that any stranger was present in either the church or the boiler room on the morning of April 22. Accordingly, the jury reasonably could have concluded that no such person was inside the church when the boiler ignited.[13]

Because the jury reasonably could have concluded that neither parishioners nor strangers were anywhere near the boiler on the morning of April 22, 1988, it is unnecessary to address their incentive to do so.

For all of these reasons, the jury reasonably could have concluded, on the basis of the following findings of fact and inferences drawn from the trial testimony, that it was more probable than not that an employee of the defendant activated the boiler: (1) some person activated the boiler; (2) that person was not the plaintiff, Cano or either of the painters; (3) that person was not a parishioner; (4) that person was not a stranger off the street; (5) at least fifteen employees of the defendant were within easy walking distance of the boiler; and

---

[12] Excluding the plaintiff, Cano and the two painters, all of whom the jury reasonably could have eliminated.

[13] The jury reasonably could have rejected the defendant's alternative suggestion that "an enemy" of the plaintiff activated the boiler. In order to conjure up the facts required to support this self-proclaimed "plausible hypothesis"—that the plaintiff had an enemy, that the enemy was homicidal, that the enemy knew the plaintiff's work schedule, that the enemy could find the boiler room, that the enemy knew how to operate a boiler, and that the enemy planned a grisly murder that would require him to pass undetected in and out of a church occupied by at least nineteen people—requires a process of extrapolation that does not find support in the record.

(6) these employees possessed both the ability and the incentive to ignite the boiler.

Because of the concurrence of both the jury's verdict and the trial court's refusal to set aside the verdict, and viewing the evidence in the light most favorable to sustaining the verdict, we are persuaded that there was sufficient evidence in the record to support the jury's finding of the defendant's liability by a fair preponderance of the evidence.[14]

---

[14] Virtually every case relied upon by the defendant to argue that the jury's verdict was based on mere speculation involves jury verdicts and directed verdicts *for the defense* that were upheld on appeal. The procedural posture of those cases is sufficient to distinguish them from the present case. As previously discussed, we are disinclined to disturb jury verdicts, and we accord great respect to the vantage of the trial judge, who possesses a unique opportunity to evaluate the credibility of witnesses. *Lopez* v. *Price*, supra, 145 Conn. 564. For these reasons, the cases cited by the defendant support the deference that we ascribe to the work of the trial judge and the jury in this case, and thus support upholding the verdict. See, e.g., *Wu* v. *Fairfield*, 204 Conn. 435, 440, 528 A.2d 364 (1987) (" '[o]n review of an allegedly inadequate verdict the Supreme Court decides only whether, on evidence presented, the jury could fairly reach the conclusion they did' ").

The defendant cited only three negligence cases in which this court has *set aside verdicts for plaintiffs*, only one of which was decided within the past sixty years. See *Toomey* v. *Danaher*, 161 Conn. 204, 286 A.2d 293 (1971); *Latham* v. *Hankey*, 117 Conn. 5, 166 A. 400 (1933); *Bates* v. *Carroll*, 99 Conn. 677, 122 A. 562 (1923). Our independent research revealed only one additional case in which this court vacated a jury's finding of negligence. *Monahan* v. *Montgomery*, 153 Conn. 386, 216 A.2d 824 (1966). The fact that the reported cases disclose so few occasions on which this court has resorted to this extraordinary remedy attests to the quality of the deference with which we insulate the work of juries. Clearly, the handful of cases in which we have set aside jury verdicts does not in any way undermine the conclusion we reach today that the jury *in this case* reasonably could have found it more probable than not that an employee of the defendant activated the boiler in which the plaintiff was injured.

Chief Justice Callahan mistakenly relies on *Wu* v. *Fairfield*, supra, 204 Conn. 440–41, and *Boehm* v. *Kish*, 201 Conn. 385, 392, 517 A.2d 624 (1986), to argue that, as a matter of law, "the defendant's possible motivation for activating the switches does not constitute sufficient evidence to support" the verdict. The plaintiff in the present case, unlike the plaintiffs in *Boehm* and *Wu*, introduced evidence as to the nature of the accident—that is, someone activated the boiler switches—and presented foundational evi-

## II

In the wake of the plaintiff's accident, the vice president of Turnpike Furnace modified the safety precautions required of his employees. Pursuant to the new procedure, employees were required to disable boilers before entering them. Once disabled, a boiler cannot ignite, even if the emergency switch and the circuit breakers are turned on. The defendant claims that the trial court committed reversible error by granting the plaintiff's motion in limine to exclude testimony pertaining to this modification. We disagree.

It is well settled that "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference. *State* v. *Castonguay,* 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe,* 195 Conn. 651, 659, 491 A.2d 345 (1985). [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make *every reasonable presumption* in favor of upholding the trial court's ruling, and only upset it for a *manifest abuse of discretion.* . . . *State* v. *Coleman,* 241 Conn. 784, 789, 699 A.2d 91 (1997). Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. *State* v. *Alvarez,* 216 Conn. 301, 306, 579 A.2d 515 (1990) . . . *State* v. *Beliveau,* 237 Conn. 576, 592, 678 A.2d 924 (1996); *State* v. *Colton,* 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996)." (Emphasis added; internal quotation marks omitted.) *State* v. *Hines,* 243 Conn. 796, 801, 709 A.2d 522 (1998).

---

dence that allowed the jury to infer that other explanations for the accident were not as plausible as the theory upon which the jury based its verdict.

The trial court reasonably could have determined that the excluded evidence was irrelevant. The defendant's contention that the evidence was relevant to "the issue of control" cannot withstand scrutiny.[15] The defendant cites no authority for its claim that a company's modification of the procedures governing its employees is relevant to that company's control over the premises of a customer serviced *prior* to the modification. Subsequent *repairs* by an *owner* on the premises indicates that person's control of the premises. *Williams* v. *Milner Hotels Co.*, 130 Conn. 507, 510, 36 A.2d 20 (1944) (evidence that defendant hotel operator obstructed ratholes day after plaintiff guest was bit by rat relevant to defendant's control over hotel). In contrast, the fact that Turnpike Furnace modified its safety precautions after the plaintiff's accident demonstrates nothing more than its ability to control its own safety precautions. More to the point, the modification neither demonstrated control nor retroactively conferred control over the particular boiler in which the plaintiff was injured.

In fact, the trial court reasonably could have concluded that the modification represents the company's insistence upon *more* control over other customers' boilers in the future than it possessed over the defendant's boiler on April 22, 1988. It is apparent that the modification does not illuminate the quantum of control that Turnpike Furnace possessed over the *defendant's* boiler on the morning of the accident: the manner in which Turnpike Furnace decided to allocate control *in the future* between itself and its *future* customers has nothing to do with the control the defendant conferred upon the plaintiff on the morning he was injured.

[15] More fully, the defendant argues "that Turnpike Furnace was in control of the area or instrumentality causing the plaintiff's injury and that, to the extent that [the defendant] was not in control, it could not be found liable for breaching a duty to the plaintiff." We discuss the nature and consequences of the measure of control possessed by Turnpike Furnace in part III of this opinion.

It bears emphasis that the defendant did not adduce any evidence tending to suggest that the defendant either did in fact authorize or would have authorized the plaintiff to disable the boiler in which he was injured. In addition, the vice president of Turnpike Furnace testified that, at the time of the accident, none of his employees—including the plaintiff—possessed either the knowledge or the ability to disable a boiler. For all of these reasons, the excluded evidence is irrelevant, and was, therefore, properly excluded.

Furthermore, the traditional rule precluding testimony regarding subsequent remedial measures promotes a compelling public policy. In the context of a defendant who attempts to ameliorate danger to others in the wake of an accident, this court has explained that "admit[ting] evidence of subsequent repairs . . . penalizes the defendant for taking remedial measures. This discourages alleged tortfeasors from repairing hazards, thereby perpetuating the danger. [Excluding this evidence] fosters the public good by allowing tortfeasors to repair hazards without fear of having the repair used as proof of negligence . . . ." *Rokus* v. *Bridgeport*, 191 Conn. 62, 67 n.1, 463 A.2d 252 (1983). The exclusion of this evidence in the present case fell squarely within the scope of this sound public policy.[16]

---

[16] The defendant's efforts to distinguish the present case from the paradigmatic subsequent remedial measure case are unavailing. Although the vice president of Turnpike Furnace did not face personal tort liability for the plaintiff's injuries, he knew that the plaintiff sought extensive damages from the defendant. If the vice president had feared that he would jeopardize the plaintiff's chances of recovery, and, thereby, its own chances—pursuant to General Statutes § 31-293 (a)—of recovering "any amount that [it] has paid or has become obligated to pay as [workers'] compensation to the injured [plaintiff]," by endeavoring to protect other employees, he very well may have waited until the trial had ended, some *eight years* after the accident, before modifying the safety precautions required of his workers.

This is the precise deterrent effect that the rule against evidence of subsequent remedial measures is designed to eliminate. By excluding the evidence, the trial court ensured that similarly situated employers in the future need not wait until the close of litigation before adopting proactive measures to

For these reasons, we are unable to find a manifest abuse of the trial court's discretion.

## III

The defendant's final claim is that the trial court improperly instructed the jury on the legal effect of the plaintiff's status as an independent contractor on "the critical liability issue of who was in control of the boiler and its related mechanisms at the time of the plaintiff's accident." Specifically, the defendant claims that it was error for the court not to instruct the jury that, as between the owner of a premises and an independent contractor, the assumption and exercise of control over the premises on which the plaintiff was injured is deemed to be in the independent contractor. The defendant contends that, had the trial court instructed the jury as requested[17] on this issue, the jury would have

protect their employees from grievous injuries. The disputed evidentiary ruling thus promoted the compelling public policy that this court has identified.

[17] The defendant filed the following request to charge:

"The law is that liability for an injury on a premises does not depend on title to that premises, but rather on who is in possession and control of the portion of the premises where the injury occurs. Thus, whoever was in possession and control of that portion of the premises where the plaintiff's injuries occurred (i.e., the boiler room) is the one charged with the duty of keeping that portion of the premises reasonably safe.

"Furthermore, as between a premises owner and an independent contractor the assumption and exercise of control over the offending area or instrumentality is deemed to be in the independent contractor. The rule is intended to go no further than to impose liability on the independent contractor under circumstances which would normally and reasonably indicate that he is the person actually in control. It amounts to no more than an application of the fundamental proposition that one who is in actual possession and control of the portion of the premises where an injury occurs is chargeable regardless of any flaw in his right of possession and control.

"The owner of premises is not responsible to an independent contractor for injury from defects or dangers which the contractor knows of, or ought to know of. But if the defect or danger is hidden and known to the owner, and neither known to the contractor nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this he is liable for resultant injury. The same rule applies to the servants of the

found that the plaintiff was in control of the boiler at the time he was injured, and, thereby, would have concluded that the defendant was not liable for negligence because it did not owe the plaintiff a duty. We disagree.

We find no merit to the defendant's argument because the issue of whether the defendant had partial or exclusive control of the boiler room and its related mechanisms at the time of the accident was irrelevant to the jury's verdict. In a "situation where the [independent] contractor has control of that portion of the premises where the accident occurs [and] . . . the owner [of the premises] has [not] retained or assumed control thereof"; *Reboni* v. *Case Bros., Inc.*, 137 Conn. 501, 507, 78 A.2d 887 (1951); "[t]he owner of [the] premises is not responsible to [the] independent contractor for injury from defects or dangers which the contractor knows of, or ought to know of." *Douglass* v. *Peck & Lines Co.*, 89 Conn. 622, 629, 95 A. 22 (1915). However, "[w]hether the owner remain[s] in partial use of the premises or not, *he is [still responsible] for injury caused to the contractor or his servants by his own negligence.*" (Emphasis added.) Id. The jury in this case determined that the plaintiff's injuries were caused by the defendant's negligence in "[f]ailing to supervise its employees, servants, and agents and failing to instruct them to avoid activating the burner or boiler while [the plaintiff] was cleaning the boiler." Therefore, regardless of whether the defendant was in control of the boiler room

contractor and to the subcontractor and his servants. It applies to a situation where the contractor has control of that portion of the premises where the accident occurs.

"Whether or not the plaintiff was an independent contractor and whether or not he was in possession and control of that portion of the premises where his injury occurred is a question for your determination from the facts before you. In this respect the law is that one who employs an independent contractor to do certain work is not liable, as a general rule, for injuries resulting from its performance."

and its related mechanisms, its negligence caused the injury to the plaintiff.

The judgment is affirmed.

In this opinion NORCOTT and PALMER, Js., concurred.

CALLAHAN, C. J., with whom MCDONALD, J., joins, dissenting. I disagree with the majority's conclusion that the evidence presented at trial was sufficient to establish that the negligence of the defendant, St. Andrew's Roman Catholic Church Corporation, was a proximate cause of the injuries sustained by the plaintiff, Thelonious Paige. Therefore, I respectfully dissent.

An essential element of any successful negligence action is the establishment of the defendant's conduct as a proximate cause of the plaintiff's injury. *Hearl* v. *Waterbury Young Men's Christian Assn.*, 187 Conn. 1, 4, 444 A.2d 211 (1982); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 41, p. 263. "The causal relation between the defendant's wrongful conduct and the plaintiff's injuries must be established in order for the plaintiff to recover damages." *Vetre* v. *Keene*, 181 Conn. 136, 139, 434 A.2d 327 (1980). To establish this causal connection, the plaintiff must "prove an unbroken sequence of events that tied his injuries to the [defendant's conduct]." *Boehm* v. *Kish*, 201 Conn. 385, 392, 517 A.2d 624 (1986); see also W. Prosser & W. Keeton, supra, p. 269. In so doing, the plaintiff must base this causal connection upon more than conjecture and surmise. *Vetre* v. *Keene*, supra, 140–41.

In its response to interrogatories, the jury found that the defendant was negligent in the following ways: (1) the defendant did not deactivate boiler number one, the boiler in which the plaintiff was injured; (2) the defendant's custodian assured the plaintiff that the boiler and burner had been deactivated, but did not

deactivate the boiler and burner properly; and (3) the defendant failed to supervise its employees, servants and agents and failed to instruct them not to activate the burner or boiler while the plaintiff was cleaning the boiler.

With respect to the issue of causation, the jury found only that the defendant's negligence constituted a proximate cause of the plaintiff's injuries. The jury, however, did not make a specific finding as to which of the defendant's alleged negligent acts was a proximate cause of those injuries. At trial, however, both the plaintiff and his coworker, Osvaldo Cano, testified that, before the plaintiff entered boiler number one, Cano verified that both boilers had been deactivated properly. In light of the undisputed testimony that Cano, as part of his job responsibilities, confirmed that the switches were off before the plaintiff entered the boiler, I believe that, as a matter of law, any alleged failure of the defendant properly to deactivate boiler number one before Cano checked the switches could not constitute a proximate cause of the plaintiff's injuries. *Hearl* v. *Waterbury Young Men's Christian Assn.*, supra, 187 Conn. 4–5; *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 383, 441 A.2d 620 (1982).

Consequently, the only possible basis for holding the defendant liable for the plaintiff's injuries is the jury's finding that the defendant negligently failed to supervise and instruct its employees, servants and agents to avoid activating the boiler while it was being cleaned. Thus, the dispositive issue in this appeal is whether there is sufficient evidence in the record to support a factual finding that an unidentified employee, servant or agent of the defendant entered the church-school facility, walked down to the boiler room, entered the boiler room, walked within approximately ten feet of Cano, activated not only the circuit breaker but also the emergency switches for boiler one, and then somehow

retraced his steps, entirely unnoticed. *Vetre* v. *Keene*, supra, 181 Conn. 139.

"In reviewing the soundness of a jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict. *Oakes* v. *New England Dairies, Inc.,* [219 Conn. 1, 12, 591 A.2d 1261 (1991)]; *Bartholomew* v. *Schweizer,* 217 Conn. 671, 687, 587 A.2d 1014 (1991). If the jury could reasonably have reached its conclusion, the verdict must stand. *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.,* 216 Conn. 40, 57, 578 A.2d 1054 (1990)." *Donner* v. *Kearse,* 234 Conn. 660, 681–82, 662 A.2d 1269 (1995). With respect to the second part of this test, we consistently have held that "[d]rawing logical deductions and making reasonable inferences from facts in evidence, whether that evidence be oral or circumstantial, is a recognized and proper procedure in determining the rights and obligations of litigants, but to be logical and reasonable *they must rest upon some basis of definite facts, and any conclusion reached without such evidential basis is a mere surmise or guess.*" (Emphasis added.) *Latham* v. *Hankey,* 117 Conn. 5, 10–11, 166 A. 200 (1933); see also *Boehm* v. *Kish,* supra, 201 Conn. 389 ("[w]hen an element necessary to a cause of action cannot be established without conjecture, the evidence presented cannot withstand a motion for a directed verdict"); *Palmieri* v. *Macero,* 146 Conn. 705, 708, 155 A.2d 750 (1959) ("[i]nferences . . . must be reasonable and logical, and the [results] based upon them must not be the result of speculation and conjecture").

The jury reasonably could have found the following facts related to whether an agent of the defendant activated the boiler switches after Cano checked to see that they had been deactivated. Boiler number one was used to supply heat to the defendant's church-school facility. The upper level of the facility included a church and an eight classroom school. Located directly below

the church on the lower level were a parish hall, a small kitchen and the boiler room.

At 7 a.m. on the morning of the accident, the ambient temperature was forty-two degrees. By 10 a.m., the temperature had risen to fifty-one degrees. School was not in session that day, but masses were scheduled for 7 a.m. and 12:10 p.m.

The defendant employed approximately fifteen to twenty people including eight teachers, a principal, maintenance and secretarial personnel, three parish priests and five nuns. Of these employees, only the maintenance personnel, the teachers and the principal worked directly in the church-school facility. The rest of the employees worked primarily in the defendant's rectory and convent, separate buildings that were located up the road from the church-school facility.

Because school was not in session, there were no school children in the church-school facility that morning. Neither party introduced any direct evidence concerning whether any of the teachers or the school principal came into work that day. John E. Gilmartin, the pastor of the parish, however, testified that he was in the church-school facility at 7:25 a.m. and again at 9:30 a.m. on the day of the accident. Gilmartin testified that on both of those occasions he did not see anyone associated with the school in the church-school facility.

Between 9:30 a.m. and 11 a.m., the approximate time of the accident, only five people are known to have entered the church-school facility. Of those five, only one, the church custodian, was the defendant's employee, servant or agent. The remaining four were the plaintiff, Cano and two painters who were independent contractors working in the church hall. Three of these men testified that they did not see anyone in the

building that morning, other than the church custodian.[1] The jury specifically determined, however, that the defendant's custodian did not activate the boiler switches after Cano had verified that they were turned off.[2] There was absolutely no other evidence that anyone other than those five persons was in the church-school facility the morning of the accident.

From the evidence previously set forth the jury was permitted to draw any and all reasonable inferences that could establish a causal connection between the defendant's conduct and the plaintiff's injuries. *Boehm* v. *Kish*, supra, 201 Conn. 392. The jury reasonably could have inferred from the temperature records and the mass schedule that if the heat was not turned on, the church would have been cold at the time of the noon mass. At most, however, that inference supports a conclusion that, had an employee of the defendant been aware that the church was cold, the employee would have had a reason to turn on the boiler switches.

The plaintiff, however, proffered no evidence that any employee of the defendant, other than the custodian, was in the church-school facility that day, or otherwise was aware that the church was cold. Without evidence that a particular employee of the defendant either was in the church-school facility, or at least was alerted to the fact that the building was cold, the jury could have relied only upon speculation and guesswork to link the defendant to the activation of the boiler switches. Therefore, I believe that, as a matter of law,

---

[1] The other painter who was present at the time of the accident did not testify at trial.

[2] The jury's verdict was as follows: "Was the defendant, ST. ANDREWS ROMAN CATHOLIC CHURCH CORPORATION, or its agents, servants, or employees, negligent in any of the following ways . . .

"f) The defendant's custodian, who assured Thelonious Paige that the boiler would remain deactivated, negligently activated the control causing the burner to ignite. Yes ___ No _X_ "

proving only the defendant's possible motivation for activating the switches does not constitute sufficient evidence to support the inference that some unknown agent of the defendant actually did so. *Wu* v. *Fairfield*, 204 Conn. 435, 440–41, 528 A.2d 364 (1987); *Boehm* v. *Kish*, supra, 201 Conn. 392.[3] The accident and the injuries sustained by the plaintiff were of a nature to evoke sympathy, but, despite the majority's struggle to uphold the jury's verdict, that verdict was based not on reasonable inferences but on pure guesswork. There is nothing in the record from which to infer the identify or affiliation of the person or persons responsible for activating the boiler switches.

Consequently, I dissent.

---

[3] Despite the majority's assurance to the contrary, there is neither direct nor circumstantial evidence from which a jury reasonably could infer that an employee of the defendant activated the switch that ignited the burner. The plaintiff presented no evidence that any employee was in the building or near the boiler at the time of the accident. The evidence presented would require the jury to speculate that it must have been an employee because an employee is more likely than other persons to have turned on the boiler because of the cold. The painters, who were known to be in the building, were just as likely to have suffered from the cold and turned on the boiler. This fodder for speculation does not constitute proof by a preponderance of the evidence. Proof of causation cannot be met by arguing that one scenario is more probable than others in the absence of some evidence, direct or circumstantial, other than the probability itself, from which the jury reasonably could find a causal connection. At most, the evidence presented by the plaintiff indicates that someone threw a switch that caused the burner to ignite, not that the person throwing the switch was an employee of the church. Though it might have been a church employee, such a conclusion constitutes a mere guess, not a reasonable inference from the scant evidence presented.