[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
This case, in which the plaintiff Uriah Jones (Jones) claimed he sustained personal injuries when he slipped and fell on an icy walkway while exiting a movie theater owned and operated by the defendant National Amusements, Inc. (National Amusements[1]), was tried to a jury on November 15, 16, 17 and 18, 1999. The jury returned a general verdict in the plaintiff's favor awarding him $19,481.40 in economic damages and $627,918.60 in non-economic damages. On November 29, 1999, National Amusements filed a motion to set aside the verdict and a motion for remittitur, see Practice Book § 16-35. The court heard oral argument on these motions on January 10, 2000 and reserved decision. This memorandum will address both motions as well as the plaintiff's motion for prejudgment interest, filed December 7, 1999, and the defendant's request for a collateral source reduction.[2]
In its motion to set aside the verdict, National Amusements claims that the jury disregarded the court's instructions on notice and damages, that the evidence was insufficient for the jury to find notice and that the jury's award of non-economic damages was inconsistent with the evidence presented at trial. In its motion for remittitur, National Amusements claims that the jury's award of non-economic damages was excessive.
I. Applicable Standards
A jury is presumed to follow the court's instructions, absent a clear indication that it did not. See, e.g., State v. Jimenez,228 Conn. 335, 342, 636 A.2d 782 (1994); New London FederalSavings Bank v. Tucciarone, 48 Conn. App. 89, 98, 709 A.2d 14
(1998). The defendant's position that the jury disregarded the court's instructions on notice and damages is premised on its view that the jury's conclusions were contrary to the evidence. Thus, these motions squarely raise the sufficiency of the evidence presented at trial. CT Page 1632
A. Sufficiency of Evidence
In considering these motions, the court is required to view the evidence in the light most favorable to sustaining the jury's verdict. See, e.g., Purzycki v. Fairfield, 244 Conn. 101, 113,708 A.2d 934 (1998) (motion to set aside verdict); Berry v.Loiseau, 223 Conn. 786, 810, 614 A.2d 414 (motion for remittitur). In evaluating the sufficiency of the evidence, the court should not act as a "seventh juror," see, e.g., Purzycki v.Fairfield, supra, 244 Conn. 112, but rather must determine "whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict." (Internal quotation marks omitted.) Ormsby v. Frankel, 54 Conn. App. 98,110, ___ A.2d ___ (1999). of course, "the plaintiff must produce sufficient evidence to remove the jury's function of examining inferences and finding facts from the realm of speculation." Paige v. Saint Andrew's Roman Catholic ChurchCorp. , 250 Conn. 14, 18, A.2d (en banc 1999), rev'g. Paige v.Saint Andrew's Roman Catholic Church Corp. , 247 Conn. 24,718 A.2d 425 (1998). However, a trial court "should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion. . . ."Salaman v. City of Waterbury, 246 Conn. 298, 304, 717 A.2d 161
(1998), quoting A-G Foods, Inc. v. Pepperidge Farm, Inc.,216 Conn. 200, 206, 579 A.2d 69 (1990). "Moreover, [i]n reviewing the jury's verdict it is well to remember that [j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) Purzycki v.Fairfield, supra, 244 Conn. 113.
B. Damages Award
As was recently stated in Ham v. Greene, 248 Conn. 508, 535-36, ___ A.2d ___ (1999), the law regarding a claim for a remittitur is "well-settled." "Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . This right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury CT Page 1633 includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. . . ." (Citations omitted; internal quotation marks omitted). Id.248 Conn. 536.
II. The Issues
 A. Notice
To prevail in this case, Jones had to establish, by a fair preponderance of the evidence, that National Amusements had actual or constructive notice of the icy condition of the sidewalk upon which he fell. National Amusements does not challenge the court's instructions on notice, but maintains that there was no evidence of actual notice and insufficient evidence to establish constructive notice. Jones concedes that there was no evidence offered to establish that National Amusements knew that the sidewalk where he fell was icy before the fall. Thus, the remaining issue is whether the jury reasonably could have found constructive notice based on the totality of the evidence.
It is undisputed that Jones was a business invitee of National Amusements and that he had been on the premises for several hours, attending a movie, before he fell when exiting the theater. "An occupier of land is chargeable with constructive notice of defects when dealing with invitees. See Sokolowski v.Medi Mart, Inc., 24 Conn. App. 276, 286, 587 A.2d 656 (1991). The determinative question is whether the defective condition existed for such a length of time that the defendant, in the exercise of reasonable care, should have discovered it and remedied it. . . . It is settled that circumstantial evidence can establish constructive notice. (Citation omitted.) Id., 286-87." (Internal quotation marks omitted) Kurti v. Becker, 54 Conn. App. 335,228-39, ___ A.2d ___ (1999). Even an absent landowner may be held responsible under a constructive notice theory, if a reasonable inspection of property would have led to the discovery CT Page 1634 of the specific defective condition in sufficient time to remedy it or warn of the danger. Warren v. Stanclif, 157 Conn. 216, 219,251 A.2d 74 (1968) (possessor of land in Florida when plaintiff slipped on icy driveway). "Constructive notice is premised on the policy determination that under certain circumstances a person should be treated as if he had actual knowledge so that one should not be permitted to deny knowledge when he is acting so as to keep himself ignorant. . . . Therefore, when a possessor of land fails to make or to have made a reasonable inspection which would have disclosed the dangerous condition, his negligent ignorance is, in the eyes of the law, equivalent to actual knowledge. . . ." (Citations omitted.) Id.
The jury was required to determine whether the icy sidewalk where Jones slipped and fell had existed for a sufficient period of time for National Amusements to have had constructive notice of it. "What constitutes a reasonable length of time within which the defendant should have learned of the defect, how that knowledge should have been acquired, and the time within which, thereafter, the defect should have been remedied are matters to be determined in the light of the particular circumstances of each case. The nature of the business and the location of the defective condition would be factors in this determination. To a considerable degree, each case must be decided on its own circumstances." (Citations omitted; internal quotation marks omitted). Sauro v. Arena Co., 171 Conn. 168, 171, 368 A.2d 58
(1976). Measuring the totality of the evidence and the reasonable inferences that could be drawn from it against these factors, the jury could have reasonably concluded that National Amusements had constructive notice of the icy sidewalk.
It is undisputed that when Jones arrived at the Showcase Cinema in North Haven, Connecticut at approximately 7:00 p. m. on January 12, 1996 the weather was cloudy and drizzling and the ground was wet. After viewing a film which lasted about two hours, he left the theater at approximately 9:30 p. m. by the north exit doors, which were not the doors he had used to enter the theater. He took a few steps in an area under an overhang and then, shortly after clearing the overhang, he slipped and fell on an icy sidewalk. Jones described the sidewalk as cold, hard and icy. At the time he fell, it was cold outside according to all the witnesses who remembered the weather.
In addition to Jones, Jeffrey Douchette, the responding paramedic, and Richard Diana, a North Haven police officer CT Page 1635 working an extra duty shift at the theater, testified that the sidewalk where Jones fell was icy.[3] Specifically, Sgt. Diana testified that "[i]t was very cold and it was icy . . . I can just make the observation that it was very packed, that he had, indeed slipped on the ice." (Transcript p. 85.) Moreover, Sgt. Diana testified that although he did not have a "vivid recollection" he remembered it was slippery and icy and he may have slipped or had a problem keeping his feet. (Transcript p. 87.) This testimony corroborated Jones's testimony that he saw one of the officers who came down from the theater "slipping, he did not have solid footing."[4] (Transcript p. 28.)
Although not abundant, this evidence was sufficient for the jury to draw an inference that the icy sidewalk had existed for a sufficient period of time prior to Jones's fall for National Amusements to have discovered the defect upon conducting a reasonable inspection. The jury could rely on its common knowledge that the condition described by Sgt. Diana of "very packed" ice could not have arisen suddenly. This inference is further supported by the evidence that it had been drizzling and the sidewalks had been wet earlier, that there was no storm in progress at the time of the fall and that the temperature was very cold.
Having some evidence before it that the icy sidewalk had existed for a sufficient period of time, the jury was then entitled to consider all the circumstances of the case, including the nature of the business and the location of the defective condition, in determining how much time constituted a reasonable length of time for the defendant to have learned of the defect.Sauro v. Arena Co., supra, 171 Conn. 171, citing Morris v. KingCole Stores, Inc., 132 Conn. 489, 492, 45 A.2d 710 (1946). There was abundant circumstantial evidence to allow the jury to draw the conclusion that National Amusements had a reasonable amount of time.
The jury could reasonably consider that Jones had been inside a darkened movie theater for more than two hours at night in January and that, although the theater personnel were aware of the times the movies let out, there was no policy in place to advise patrons of any change in the weather or drop in temperature. Furthermore, the jury could consider that the theater's layout encouraged patrons such as Jones to use certain exit doors as a factor in assessing the reasonableness of the length of time. Cf. Cooks v. O'Brien Properties, Inc., CT Page 163648 Conn. App. 339, 347, 710 A.2d 788 (1998) (Evidence of availability of alternative means of egress may be used by jury in assessing the circumstances.); Ford v. Hotel Restaurant Empoyees BartendersUnion, 155 Conn. 24, 34, 229 A.2d 346 (1969) (Invitation includes part of premises held open as means of egress.).
Furthermore, John Guzzi, the manager on duty that night, who testified that he knew the times when the movie shows were over, stated that he regularly inspected the premises in January 1996 to determine if he needed to direct his ushers to apply ice-melting chemicals that the theater kept on the premises because he wanted to provide a safe environment to keep the patrons safe. Although Guzzi had no specific recollection whether he inspected on January 12, 1996, he testified that it was his regular practice to make periodic checks if the weather forecast was bad. Even though Guzzi had no specific recollection of the weather forecast for January 12, 1996, he testified that he watched the Weather Channel religiously. Given the evidence that it had been a particularly stormy week,[5] the jury could reasonably draw an inference that Guzzi watched the Weather Channel on January 12, 1996. In addition, Guzzi recalled that there was precipitation from the previous storms, in the form of snow and frozen slush, in the planted areas abutting the sidewalk where Jones fell. The jury could rely on this evidence to draw an inference that it would have been reasonable for Guzzi to periodically check the sidewalk where Jones fell on January 12, 1996, as was his usual practice.
Finally, the jury could consider the testimony of Anthony Coppola, who was the contractor responsible for removing snow and ice from the premises. Coppola testified that he personally cleaned the walks and put down sand on January 12, 1996, but had no recollection what time of day he did that work.[6] Jones testified there was no sand or salt in the area where he fell. After Jones fell, Sgt. Diana and Sgt. Onofrio observed theater personnel come outside and start to spread salt on the ice.
Considering all the circumstantial evidence in the light most favorable to sustaining the jury's verdict, the court concludes that the jury could have reasonably found that the icy sidewalk where Jones fell had existed for a length of time and that if National Amusement's personnel had conducted a reasonable inspection before the movie got out, the defect would have been discovered. Thus, the evidence was sufficient to find that National Amusements had constructive notice and was charged with CT Page 1637 the duty of remedying the defect or warning Jones.
B. Damages
National Amusements argues that the jury's award of non-economic damages in this case is so disproportionate to the economic damages awarded that it suggests that the jury failed to consider the evidence in making its award. "[T]he relation between the amount of special damages and the amount of damages awarded does not control the question of the excessiveness of the award." Collins v. Wetherbee, 31 Conn. App. 518, 521,625 A.2d 838 (1993) (fact that jury award is forty-five times the amount of special damages is not dispositive). "Moreover, the amount of a damage award is a matter particularly within the province of the jury, and the assessment of damages always defies any precise mathematical computation." Shegog v. Zabrecky, 36 Conn. App. 737,752, 654 A.2d 771 (1995).
A jury's award of damages should not be set aside or remitted simply because it is generous. The court should act only if the award is "plainly excessive and exorbitant," Wood v. Bridgeport,216 Conn. 604, 611, 583 A.2d 124 (1990), or "so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." Hamv. Greene, supra, 248 Conn. 536. Neither circumstance is present in this case.
There was more than ample evidence upon which the jury could base its award of noneconomic damages. Although Jones was 71 years old at the time he fell and had diabetes, high blood pressure and arthritis, he testified that all his conditions were manageable and did not affect the quality of his life. In fact, on January 12, 1996 he went to the movies after spending time at the North Haven YMCA where he testified he did mild exercise and relaxed in the health club. The jury heard that Jones was in intolerable pain following the fall and that he has remained in constant and chronic pain, at least in his low back, since that time. Jones also testified that his ability to move was completely affected by the fall and the jury could observe, as did the court, that he stooped as he walked, needing a cane as an aid, and walked, stood and sat with great difficulty. He had not used a cane before January 12, 1996.
There was substantial evidence from Jones's medical providers documenting his reports of pain. Initially, Jones reported head CT Page 1638 pain and pain in his neck, upper back and lower back, as well as persistent headaches. Although the headaches, head pain and upper back pain eventually resolved, the lower back pain remained chronic.[7] Jones treated with physicians, physical therapists and a chiropractor for his pain. Dr. Samuel Bridgers, who was Jones's treating neurologist, testified that Jones's physical complaints were in proportion to his findings upon examination and that Jones was not having significant problems with his back until he fell. Bridgers viewed the chiropractic treatment as appropriate for Jones's pain.
Furthermore, Bridgers testified that Jones suffered from a herniated disk in his lumbar spine as a result of the fall and that the fall aggravated underlying degenerative changes in Jones's cervical and lumbar spine that had previously been asymptomatic. Dr. Bridgers gave Jones a permanency rating of 10% for the cervical spine and 20% for the lumbo-sacral spine and attributed half the permanency to the pre-existing degenerative condition and half to the fall. The jury also had before it documentary evidence from Dr. Gary Bloomgarden, a neurosurgeon to whom Dr. Bridgers had referred Jones for a surgical assessment, which stated that the fall "contributed greatly to this patient's current level of pain and disability." (Ex. A, March 25, 1999 letter of Dr. Bloomgarden to Dr. Bridgers.)
Jones testified that he suffered emotionally as a result of the limitations on his activities following the fall. Dr. Bridgers prescribed paxil, an antidepressant, to Jones in January 1997, after Jones admitted he was depressed because he was in chronic pain. The paxil did not lessen the pain, but simply allowed Jones to cope with it. However, Jones stopped taking the paxil because he disliked the side effects.
Jones testified that his chronic pain prevented him from participating both in activities that he used to do and in activities he wanted to do. Jones told the jury that he was unable to participate in any activity which required mobility. The jury heard that Jones had been involved in the sport of fencing for about forty years and participated as a world class fencer, winning numerous medals. He was the first black man in the history of the United States to make the Olympic fencing team and was ranked among the top ten fencers in this country for ten consecutive years. Jones testified that although he had not fenced competitively in decades and had last taught fencing in 1991, he had recent opportunities to teach fencing to inner-city CT Page 1639 youth which he had to turn down because of his physical condition.
National Amusements points out that Jones was 71 years old at the time of the fall and that his stipulated life expectancy at the time of trial was 9.1 years. These facts do not undermine the jury's award. Rather, a jury may appropriately consider "that the injury to a man [in his seventies] was more painful and disabling than it would have been to a younger person." Ruda v. McKinstry,162 Conn. 268, 273, 294 A.2d 318 (1972) (Plaintiff, 74 years old, sustained a whiplash injury of neck and back superimposed over pre-existing arthritis and had been in chronic pain for twenty-two months.) See Samose v. Hammer-Passero NorwalkChiropractic, 24 Conn. App. 99, 108-09, 586 A.2d 614 (1991) (Verdict of approximately $472,000 not excessive even though plaintiff had a 7-year life expectancy in light of evidence of permanent injury and that plaintiff had to curtail active life, even though he still conducted social and business affairs.)
The jury's award of non-economic damages in this case, albeit generous, is amply supported by the evidence. The award does not shock the conscience nor is there any evidence in the record that suggests the award was the result of mistake, partiality, prejudice or corruption. Accordingly, there is no basis to remit the award or set aside the jury's verdict.
III. Conclusion
For the reasons stated above, the defendant's Motion to Set Aside Verdict and Motion for Remittitur are denied. Judgment shall enter in favor of the plaintiff and against the defendant in accordance with the provisions of the next paragraph.
The parties have stipulated that the defendant is entitled to a set-off of collateral source payments pursuant to General Statutes § 52-225a in the amount of $4,418.33. The jury's award of economic damages in the amount of $19,481.40 is accordingly reduced by that amount and the economic damages awarded to the plaintiff shall total $15,063.07. The jury's award of noneconomic damages in the amount of $627,918.60 shall remain, for a total damages award of $642,981.67. The parties have stipulated that prejudgement interest has accrued in the amount of $64,298.16 from March 12, 1999, the date the plaintiff filed his offer of judgment, through January 12, 2000 and at the rate of $211.39 per day thereafter until the date of the entry of the CT Page 1640 judgment. Prejudgement interest is awarded in accordance with the stipulation.
Linda K. Lager, Judge