## THELONIOUS PAIGE v. SAINT ANDREW'S ROMAN CATHOLIC CHURCH CORPORATION ET AL. (SC 15866)

Callahan, C. J., and Borden, Berdon, Norcott, Palmer, McDonald and Peters, Js.

Argued January 12—officially released August 3, 1999

*John B. Farley*, with whom were *Mark R. Cramer* and, on the brief, *James V. Somers*, for the appellant (named defendant).

*Vincent M. Musto*, with whom was *Lillian C. Gustilo*, for the appellee (plaintiff).

BORDEN, J. The dispositive issue in this appeal is whether there was sufficient evidence to support the jury's factual finding that the negligence of an unidentified employee, agent or servant of the defendant caused the plaintiff's injuries. The named defendant, St. Andrew's Roman Catholic Church Corporation,[1] appeals[2] from the judgment of the trial court, following a jury trial, in which the jury found for the plaintiff, Thelonious Paige. We conclude that the evidence of causation was insufficient. Accordingly, we reverse the judgment of the trial court.

The plaintiff brought this action against the defendant, as the owner of church property known as St. Andrew's Roman Catholic Church. It is undisputed that, while the plaintiff was inside and cleaning one of the boilers that heated the church premises, the boiler's oil

---

[1] The plaintiff initially had brought an action against several additional parties, namely: (1) Gary D'Amico and Carl Coletta, the painters who were working inside the defendant's building when the plaintiff was injured; (2) Santa-Superior Fuel, Inc.; (3) the Bridgeport Roman Catholic Diocesan Corporation; and (4) St. Andrew's Roman Catholic Church Voluntary Association. Summary judgment was granted in favor of D'Amico and Coletta prior to trial because there was insufficient evidence that either of them had turned the boiler on, and the claims against Santa-Superior Fuel, Inc., the Bridgeport Roman Catholic Diocesan Corporation, and the St. Andrew's Roman Catholic Church Voluntary Association eventually were withdrawn. Hereafter, all references to the defendant are to St. Andrew's Roman Catholic Church Corporation.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred this appeal to this court pursuant to Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c). Initially, a majority of a five member panel of this court consisting of Chief Justice Callahan and Justices Berdon, Norcott, Palmer and McDonald affirmed the trial court's judgment. *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 247 Conn. 24, 41, 718 A.2d 425 (1998). Thereafter, the court granted the defendant's motion for reconsideration en banc. Justices Borden and Peters were added to the panel and considered the briefs, and oral argument en banc was held on the question of the sufficiency of the evidence to support the verdict. This opinion supersedes our prior decision; id.; in all respects.

burner ignited, causing him serious injuries. The issue in contention was whether the defendant was legally responsible for the fact that the oil burner was turned on while the plaintiff was cleaning the boiler. The jury returned a verdict for the plaintiff in the amount of approximately $3.2 million in economic and noneconomic damages. The defendant moved for judgment notwithstanding the verdict, which the trial court denied. This appeal followed.

The defendant claims that there was insufficient evidence from which the jury reasonably could have concluded that an employee, agent or servant of the defendant turned on the oil burner while the plaintiff was cleaning the boiler. We agree.[3]

"The standard for reviewing the denial of motions to set aside the verdict and for judgment notwithstanding the verdict on evidentiary grounds is clear. Our review of the trial court's refusal to [grant the motions] requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion. . . . *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988)." (Internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 242 Conn. 255, 277, 698 A.2d 838 (1997). We apply this familiar and deferential scope of review, however, in light of the equally

---

[3] This conclusion renders it unnecessary to consider the defendant's other claims on appeal, namely, that the trial court improperly: (1) excluded evidence regarding the purported control over the boiler in issue by the plaintiff's employer; and (2) instructed the jury regarding control of an instrumentality or area as between an owner of the premises and an independent contractor.

familiar principle that the plaintiff must produce sufficient evidence to remove the jury's function of examining inferences and finding facts from the realm of speculation. *Boehm* v. *Kish,* 201 Conn. 385, 389, 517 A.2d 624 (1986) ("[w]hen an element necessary to a cause of action cannot be established without conjecture, the evidence presented cannot withstand a motion for a directed verdict"). Moreover, it is well established that, although the jury is entitled to disbelieve any evidence, it may not draw a contrary inference on the basis of that disbelief. *Novak* v. *Anderson,* 178 Conn. 506, 508, 423 A.2d 147 (1979) ("[w]hile it is true that it is within the province of the jury to accept or reject a defendant's testimony, a jury in rejecting such testimony cannot conclude that the opposite is true").

The evidence, viewed in the light most favorable to the plaintiff, was as follows. In April, 1988, the plaintiff was an employee of the Turnpike Furnace Company (Turnpike Furnace). On the morning of April 22, 1988, the plaintiff and a coworker, Osvaldo Cano, were assigned to clean the defendant's two boilers (boiler number one and boiler number two). Cano was the "leadman" on the job, with the plaintiff acting as his assistant. The plaintiff and Cano had worked together as leadman and assistant once or twice a week for approximately six months prior to April 22, 1988.

The defendant's properties consisted of: (1) a church; (2) a convent located across the street from the church; and (3) a rectory located at the top of a hill on the street where the church was located. The church was a two-story facility that consisted of: (1) a church that could hold approximately 800 people; (2) a school that instructed approximately 210 students in grades one through eight; and (3) a parish hall that could hold approximately 350 people. The boilers provided heat to both the church and the school, and were located in a separate room, near the parish hall, on the lower

level of the church. A person could access the boiler room from the church, the school or the parish hall, without ever having to go outside of the facility.

The defendant employed approximately twenty persons, including three priests, three nuns, eight lay teachers, one school principal, two secretaries, three custodial workers, one housekeeper and one cook. Of these employees, only the teachers,[4] the principal, the custodial workers and the priests worked in the church building. The secretaries, the cook and the housekeeper worked up the hill in the rectory, and the nuns resided in the convent across the street.

On April 22, 1988, the date of the accident, the school was not in session because of a spring recess. Two painters, Gary D'Amico and Carl Coletta,[5] who were not employees of the church, were working inside of the building. Juan Hernandez, the maintenance supervisor, was scheduled to work from 9 a.m. to 5 p.m. on April 22, and visited the boiler room upon arriving at work and spoke for several minutes with the plaintiff and Cano, who were already at work.[6]

That same day, masses were held at 7 a.m. and at 12:10 p.m. Father John E. Gilmartin celebrated the 7 a.m. mass, and a different priest, who did not testify at trial, celebrated the 12:10 p.m. mass.[7] The temperature on April 22 reached forty-two degrees fahrenheit at 7

---

[4] The evidence indicates that of the five nuns who lived in the convent across the street, three worked for the parish. It is not clear whether they were employed as teachers or in some other capacity.

[5] See footnote 1 of this opinion.

[6] Hernandez testified that on April 22, 1988, he had a crew of two persons working with him, and that he and his crew had been at lunch, away from the church, from approximately 11 a.m. to 12 p.m. Hernandez testified that he had learned about the accident upon returning from lunch at several minutes before noon.

[7] Gilmartin testified that he had not spoken with or seen the other priest in approximately seven or eight years. This was the only evidence presented relating to the other priest.

a.m., fifty-one degrees at 10 a.m., and fifty-six degrees at 1 p.m.

At 8:30 a.m., when the plaintiff and Cano arrived at the church, the building and the boiler room were unlocked. They noticed that boiler number two was warm to the touch and glowing fluorescent orange, indicating that it recently had been in operation. As was generally the practice before cleaning a boiler, Cano checked to make sure that each of the switches on the control panel was in the off position. Although boiler number two felt warm, it was not running at the time that the plaintiff and Cano arrived, and the control panel switch indicated that both boilers were off. According to the plaintiff's expert, based on the amount of time the boiler ordinarily would take to cool down, the boiler must have been operating within six to ten hours of the plaintiff's and Cano's arrival. Both boilers remained off from the time that the boiler cleaners arrived, until the plaintiff was injured.

Due to the size of the two boilers, it was necessary to clean them from the inside. After it was decided that the plaintiff would take the first turn at working on the inside, and that Cano would pass him the necessary equipment from the outside, the plaintiff entered boiler number one. The plaintiff was wearing a protective suit and face mask, which served to protect him against breathing in or absorbing soot into his skin.

Approximately one-half hour after the plaintiff had entered boiler number one, its oil burner was activated.[8] Flames blocked the hatchway doors, rendering it impossible for the plaintiff to escape. Upon hearing the plaintiff's screams, Cano pulled the vacuum hose that was used in the cleaning process out of the boiler, and attempted to pull the plaintiff through the hatchway

---

[8] The Bridgeport fire department and the paramedics received the alarm at 11:20 a.m.

door. Unable to free the plaintiff, Cano ran to the boiler room door and screamed for help. The painters heard his screams and came to the boiler room. While Coletta was spraying the flame with a fire extinguisher, Cano began hitting the switches in an attempt to extinguish the flame. Cano found, however, as he relayed to the fire marshal who arrived on the scene shortly after the accident, that the switches were already in the off position.[9]

Coletta eventually was able to pull the plaintiff from the boiler. Fire and paramedical assistance arrived shortly thereafter, and the plaintiff was taken to the hospital. As the result of the accident, the plaintiff suffered extensive third and fourth degree burns over two thirds of his body, with burns down to the bones on his legs and his ankles. With the exception of his head, his upper arms and a portion of his upper torso, the plaintiff remains scarred over most of his body.

According to both parties' experts, in order for the burner to have ignited, both the circuit breakers, which were located on the wall opposite the boilers, and the emergency switches[10] would have had to have been activated. On the date of the accident, all of the circuit breakers and the emergency switches were located

---

[9] During his deposition, Cano testified that when he turned toward the switches intending to turn them off, he noticed that they were already in the off position, and that he had told this to the fire marshal who arrived on the scene shortly thereafter. His original testimony during the trial, however, was that he had never moved or turned away from the boilers. When his deposition testimony was read back to him, however, he conceded that his original recollection, as indicated in the statement that he had signed in May, 1988, was that the burner switches were off immediately following the incident.

[10] Hernandez testified that "[i]f you were facing . . . boiler number one [the emergency switch to boiler number one] . . . will be right behind you approximately five feet . . . ." Gilmartin estimated that the emergency switches were located approximately eight feet away from boiler number one, and that the circuit breakers were located approximately eight to ten feet away from boiler number one.

inside of the boiler room, and the only possible way to access these controls was to enter the boiler room.[11] Moreover, the plaintiff's expert testified that there would be at least a fifteen second delay between the switches being activated and the ignition of a flame. The plaintiff's expert also stated that, in his opinion, the circuit breakers and the emergency switches were functioning properly on April 22, 1988. On the basis of all of the available evidence, and viewing that evidence in the light most favorable to the plaintiff, it is therefore apparent, and the parties do not dispute, that the only way that the oil burner serving boiler number one could have ignited while the plaintiff was inside cleaning the boiler, would be if someone had entered the boiler room and had activated both the circuit breakers and the emergency switches.

Gilmartin, who had been assigned to the church in 1986, had overall responsibility for daily management of the parish. This included responsibility for maintaining the boilers. It was Gilmartin, therefore, who had arranged for Turnpike Furnace to clean the boilers on April 22, 1988. Because Gilmartin previously had arranged for Turnpike Furnace to clean the boilers, he was aware that the boilers were supposed to be shut off the night before they were to be cleaned.

On April 22, 1988, both Gilmartin and Hernandez were responsible for controlling access to the boiler room. Hernandez had been advised by an employee of Turnpike Furnace the night before the boiler cleaners were to arrive that he was to shut off the boiler's oil burners. Before he left work on April 21, therefore, at approximately 5 p.m., Hernandez shut the burners off and locked the door to the boiler room. Neither Gilmartin nor Hernandez, however, had instructed or made any

[11] As previously noted, the boiler room could be accessed directly from the church, the parish hall and the school.

efforts to warn people that the boilers were to be cleaned on April 22, and that, therefore, all persons should stay away from the boiler room, and that the boilers needed to remain off. Similarly, neither took any action to restrict the access of persons to the boiler room during the time that the boilers were being cleaned. Gilmartin testified, moreover, that he did not know who had opened the boiler room door on the morning of April 22. Hernandez testified that, to his knowledge, only he and Gilmartin possessed keys to the boiler room. Gilmartin testified consistently, stating that he and Hernandez had keys, and that he did not know whether any other priest had a key. There was no evidence regarding whether any other employee possessed a key to the boiler room.

The plaintiff testified that Hernandez was the only employee of the defendant that he had seen on the morning of the accident. Hernandez also testified that, other than the two maintenance persons working with him and who had been with him at lunch during the time of the accident, he had not seen any other person in the church on that morning.[12] Gilmartin similarly testified that he was not aware of any employee, other than himself and the other priest who had celebrated the 12:10 p.m. mass, being in the church on the morning of the accident. Gilmartin also testified that he had been away from the church property between 9:30 a.m. and 12:30 p.m., that he had been in the hallway near the boiler room at approximately 8:30 a.m., and that he had seen the boiler cleaners coming in with their equipment.

Hernandez and Gilmartin were the only employees of the defendant who testified during the trial. The record, therefore, does not contain the testimony of the

---

[12] Hernandez testified specifically that he had not seen any teachers, the principal, any school employees, or any person other than the boiler cleaners and the painters in "the church, the school, the hall, or the lobby area" on the morning of the accident.

principal, the cook, the housekeeper, or any secretary, teacher or other custodial worker with regard to their whereabouts on the morning of April 22. There was no evidence, moreover, that any of these employees had even been in the church, not to mention in the boiler room, on the morning of April 22, 1988. In other words, no evidence was presented that placed any employee of the defendant, other than Hernandez, near the boiler switches on the morning of the accident.

The defendant claims that there is insufficient evidence to support the jury's finding that its conduct causally was connected to the plaintiff's injuries. We agree. After a thorough search of the record, we conclude that there was insufficient evidence of a causal connection between the defendant's conduct and the plaintiff's injuries and that, therefore, the evidence does not support the finding that the defendant's conduct was a proximate cause of the plaintiff's injuries. Specifically, in view of the jury's responses to the interrogatories submitted to it, there was insufficient evidence from which the jury reasonably could have inferred that an employee, agent or servant of the defendant activated the circuit breakers and the emergency switches while the plaintiff was inside boiler number one. Any such inference would be based on nothing more than speculation, and cannot form the basis of the verdict.

"To prevail on a negligence claim, a plaintiff must establish that the defendant's conduct legally caused the injuries. *Wu* v. *Fairfield*, 204 Conn. 435, 438, 528 A.2d 364 (1987); *Hearl* v. *Waterbury YMCA*, 187 Conn. 1, 4, 444 A.2d 211 (1982); W. Prosser & W. Keeton, Torts (5th Ed.) § 41, p. 263. As we observed in *Kowal* v. *Hofher*, 181 Conn. 355, 359, 436 A.2d 1 (1980), [l]egal cause is a hybrid construct, the result of balancing philosophic, pragmatic and moral approaches to causation. The first component of legal cause is causation in fact.

Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. Id.

"The second component of legal cause is proximate cause, which we have defined as [a]n actual cause that is a substantial factor in the resulting harm . . . . *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 383, 441 A.2d 620 (1982). *Boehm* v. *Kish*, [supra, 201 Conn. 391]. The proximate cause requirement tempers the expansive view of causation [in fact] . . . by the pragmatic . . . shaping [of] rules which are feasible to administer, and yield a workable degree of certainty. 2 Harper & James, Torts § 20.4, p. 1133. Remote or trivial [actual] causes are generally rejected because the determination of the responsibility for another's injury is much too important to be distracted by explorations for obscure consequences or inconsequential causes. *Kowal* v. *Hofher*, supra, [181 Conn.] 359–60. In determining proximate cause, the point beyond which the law declines to trace a series of events that exist along a chain signifying actual causation is a matter of fair judgment and a rough sense of justice. See generally *Palsgraf* v. *Long Island R.R. Co.*, 248 N.Y. 339, 352, 354–56, 162 N.E. 99 (1928) (Andrews, J., dissenting). *Boehm* v. *Kish*, supra, 391–92." (Internal quotation marks omitted.) *Doe* v. *Manheimer*, 212 Conn. 748, 757–58, 563 A.2d 699 (1989), overruled in part on other grounds, *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 608, 662 A.2d 753 (1995).

We have held, moreover, that "the test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. *Nelson* v. *Steffens*, 170 Conn. 356, 363, 365 A.2d 1174 (1976) (*Bogdanski, J.*, dissenting); see also *Hearl* v. *Waterbury YMCA*, [supra, 187 Conn. 4]. Further, it is the plaintiff who bears the burden to prove an unbroken sequence of

events that tied his injuries to the [defendants' conduct]. *Boehm* v. *Kish*, [supra, 201 Conn. 392]; see also W. Prosser & W. Keeton, supra, p. 269. The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. *Peterson* v. *Oxford*, 189 Conn. 740, 749, 459 A.2d 100 (1983). This causal connection must be based upon more than conjecture and surmise. *Vetre* v. *Keene*, supra, [181 Conn. 136, 140-41, 434 A. 2d 327 (1980)]." (Internal quotation marks omitted.) *Wu* v. *Fairfield*, supra, 204 Conn. 438–39.

We focus our inquiry, therefore, on the connection, if any, between the defendant's conduct and the plaintiff's injuries. In order for the defendant to be held legally responsible for the plaintiff's injuries, there must have been a causal connection between the plaintiff's injuries and the conduct of an employee, agent or servant of the defendant. The verdict must be set aside if we determine that the jury could not have reasonably concluded that such conduct legally caused the plaintiff's injuries. *Suarez* v. *Dickmont Plastics Corp.*, supra, 242 Conn. 277. As we have indicated, the application of this test to the evidence in the present case requires evidence from which the jury reasonably could have inferred that an employee, agent or servant of the defendant activated the circuit breakers and the emergency switches while the plaintiff was inside the boiler and Cano was assisting him from the outside.

The jury found, as indicated by their responses to the interrogatories,[13] that the defendant was negligent

---

[13] The interrogatories relevant to the issue of the defendant's negligence were answered by the jury as follows:

"1. Was the defendant . . . or its agents, servants, or employees, negligent in any of the following ways (please respond to each item)?

"a) Failing to deactivate the boiler in which [the plaintiff] was injured. "Yes.

"b) Failing to see to it that the boiler in which [the plaintiff] was burned remained inoperable while he was in the process of cleaning it.

in the following ways: (1) failing to deactivate the boiler in which the plaintiff was injured; (2) failing to supervise its employees, servants, and agents while the plaintiff was cleaning the boiler; and (3) failing to instruct its employees, servants and agents not to activate the burner or the boiler while the plaintiff was cleaning it. The jury also found that the defendant was negligent through the actions of Hernandez, who, according to the jury's response, had assured the plaintiff that the boiler and the burner had been deactivated, but subsequently failed to deactivate the boiler and the burner properly. The jury also found, however, that the defen-

---

"No.

"c) Failing to adequately control access to the boiler controls, thermostats and all other controls which could activate the burner while [the plaintiff] was cleaning the boiler.

"No.

"d) Failing to supervise its employees, servants, and agents and failing to instruct them to avoid activating the burner or boiler while [the plaintiff] was cleaning the boiler.

"Yes.

"e) Failing adequately to inspect the burner, boiler, electrical system, and control mechanisms before [the plaintiff] entered the boiler to ensure that they had placed the burner in an inoperable condition while [the plaintiff] was cleaning the boiler.

"No.

"f) The defendant's custodian, who assured [the plaintiff] that the boiler would remain deactivated, negligently activated a control causing the burner to ignite.

"No.

"g) The defendant's custodian, in spite of assuring [the plaintiff] that the boiler and burner had been deactivated, failed to properly deactivate the boiler and burner.

"Yes.

"h) Failing to take or cause to be taken preventive measures to eliminate the exposure of others to probable injuries which the defendant knew or should have known would occur in the performance of the work of cleaning the boilers at St. Andrew's Parish.

"No. . . .

"2. If you found that the defendant . . . or its agents, servants, or employees, were negligent, was that negligence at least one proximate cause of (a substantial factor causing) the injuries to [the plaintiff]?

"Yes. . . ."

dant was *not* negligent in: (1) failing to see to it that the boiler in which the plaintiff was burned remained inoperable while he was in the process of cleaning it; (2) failing to control adequately access to the boiler controls, the thermostats and all other controls that could activate the burner while the plaintiff was cleaning it; (3) failing to inspect adequately the burner, the boiler, the electrical system, and the control mechanisms before the plaintiff entered the boiler to ensure that the defendant had placed the burner in an inoperable condition while the plaintiff was cleaning it; and (4) failing to take or cause to be taken preventive measures to eliminate the exposure of others to probable injuries that the defendant knew or should have known would occur during the course of cleaning the boilers. Furthermore, the jury found that Hernandez had not negligently activated a control causing the burner to ignite.

The jury findings must be evaluated in light of the mechanical details disclosed by the evidence. As noted, the evidence established that the switches and the controls to boiler number one were functioning properly on the morning of the accident, and that, therefore, someone must have activated both the circuit breakers and the emergency switches in order for boiler number one's burner to have ignited. Moreover, although the jury specifically found that the defendant was negligent in failing to *supervise its employees, servants and agents,* and in failing to *instruct them* to refrain from activating the boiler, the jury also found that the defendant was not negligent in failing to control access to these controls, or in failing to ensure that boiler number one's burner remained inoperable while the plaintiff was cleaning the boiler. Thus, with regard to the accident at issue, the jury found that the defendant's negligence was limited to the manner in which it dealt with its own employees, servants and agents. In order for

there to have been a causal connection between the defendant's negligent conduct and the plaintiff's injuries, therefore, it would have had to have been an employee, agent or servant of the defendant who activated the switches that resulted in the ignition of the burner. Furthermore, the converse is equally true: because the jury found that the defendant was not negligent either in controlling access to the boiler controls, or in ensuring that the boiler was rendered inoperable while the plaintiff was cleaning it, the defendant's conduct cannot be causally linked to the plaintiff's injuries if the burner was activated by a person who was *not* an employee, agent or servant of the defendant.

The jury specifically found that Hernandez, the only employee of the defendant placed near the boiler room on the morning of the accident,[14] had not activated the controls that caused the boiler to ignite. Furthermore, although the jury found that Hernandez had failed to deactivate the boiler that the plaintiff was cleaning, Hernandez had testified that he had done so, and Cano testified that prior to commencing the cleaning of the boilers on the morning of the accident, he had made sure that all of the switches and the controls to the boilers were off. Thus, the jury properly could not have based their findings on a disbelief of Hernandez' testimony; *Novak* v. *Anderson*, supra, 178 Conn. 508; and any causal connection between Hernandez' conduct and the plaintiff's injuries was severed by Cano's testimony. The "plaintiff . . . bears the burden to prove an unbroken sequence of events that tie[s] his injuries to the [defendant's conduct]." (Internal quotation marks omitted.) *Wu* v. *Fairfield*, supra, 204 Conn. 438–39; *Boehm* v. *Kish*, supra, 201 Conn. 392. Because Hernandez was

[14] As noted, Gilmartin testified that he had been in the hallway when the boiler cleaners were arriving. His testimony indicates that he did not go down to the boiler room, however, until after he had returned to the church at 12:30 p.m. and had learned of the accident.

the only employee of the defendant placed near the boiler room on the morning of April 22, 1988, this break in the chain of events connecting his conduct to the plaintiff's injuries is fatal to the plaintiff's claim.

In an attempt to link the conduct of an unidentified employee of the defendant to the plaintiff's injuries, the plaintiff asserts that "[o]nly employees of the defendant had keys to the boiler room." There was no evidence offered, however, to support this assertion.[15] In fact, when asked who unlocked the boiler room on the morning of April 22, and whether it was possible that someone other than Gilmartin and Hernandez had possessed keys to the boiler room, Gilmartin, *the person in charge of managing the routine affairs of the church,* responded that he did not know.[16] Thus, the evidence does not rule out the possibility that persons other than an employee of the defendant also might have possessed keys to the boiler room. This issue is, nonetheless, not determinative because the boiler room was open throughout the cleaning process, thereby providing ready access to any person seeking to activate a boiler, regardless of whether he or she possessed a key.

Moreover, as noted, school was not in session on the date of the accident. Thus, only creative guesswork could lead to the conclusion that it was the principal or a teacher, none of whom resided in the church building,

---

[15] Moreover, we note that there was no evidence necessarily establishing that the person who opened the door actually had activated the switches to the boiler. In fact, the evidence is to the contrary, given that the doors to the boiler room remained open while the plaintiff was inside the boiler and Cano testified that the switches were all in the off position prior to the commencement of the cleaning process.

[16] During his deposition, Gilmartin had indicated that he had opened the boiler room door early on the morning of April 22, 1988. During the trial, he stated that he wanted to correct that earlier statement: "I want to be really accurate about it and I . . . have to change that testimony and say I didn't, [to] the best of my knowledge I didn't go down. . . . So I did not open the doors that morning."

who had activated the boiler. It would require similar creative reasoning to conclude that it was either the cook, the housekeeper or one of the secretaries, all of whom worked in the rectory,[17] that had activated the boiler, given the lack of any factual support for the inference that any of these persons was even in the church on the morning of the accident.

The plaintiff and Cano, furthermore, each testified that Hernandez was the only employee of the defendant that they had seen between the time they had arrived at the church and the time the plaintiff was injured. Finally, Gilmartin testified that he had not seen and was not aware of any specific persons affiliated with the church or school—other than the priests who celebrated the masses—being present on the church or the school property on the morning of April 22, 1988.[18] Gilmartin also was unable to identify any of the persons, with the exception of the fire chief, who were gathered near the boiler room discussing the accident after the plaintiff had been taken to the hospital. Given that Gilmartin had responsibility for the management of the parish and had been with the church since 1986, it is unlikely that one of the defendant's approximately twenty employees was among the "four or five people" gathered together after the accident, and that Gilmartin simply could not identify them at the time of trial. It would be pure conjecture, therefore, to conclude that any employee of the defendant's had: (1) entered the boiler room while Cano was assisting the plaintiff without Cano even realizing that someone had entered the

---

[17] Hernandez testified that the boilers in the church heated only the church and the school, and had no other function. Any chill in the rectory, therefore, would not be remedied by the activation of either boiler number one or boiler number two.

[18] Gilmartin was able to testify only that, although he had not seen any persons affiliated with the church, he did not know "whether [the principal] was there or not," and that when he had arrived back at the church, after leaving the property from approximately 9:30 a.m. to 12:30 p.m., a church secretary had advised him that there had been an accident.

room;[19] (2) activated both the circuit breakers and the emergency switches to the boiler, which were located on different walls in the boiler room; (3) left the boiler room, without ever having been noticed by Cano; and (4) ignored the plaintiff's screams for help.[20]

The plaintiff argues, nonetheless, that "[t]he jury could reasonably conclude that an employee of the defendant activated the boiler in the early morning of April 22, in response to the cold temperatures and in anticipation of a 7 a.m. mass or simply because heat was needed in the building. Having failed to instruct its employees to avoid activating the boilers, those employees would have no reason not to turn on the boilers when they found the facility in need of heat on a cold morning. Further, the jury could reasonably conclude that the boilers were most likely activated by an employee of the defendant rather than anyone else." Given, however, that the jury determined that Hernandez, the one employee who may have possessed more knowledge of the boiler's location and operation than a nonemployee, had not activated the boiler, on the evidence presented, only pure speculation could have lead the jury to conclude that an employee would have been more likely than someone else, for example, one of the painters or a parishioner, to have noticed the cold and activated the boiler. According to Gilmartin, approximately fifty persons may have attended the 12:10 p.m. mass, and the evidence indicated that the boiler room door was both open and accessible from the church, the parish hall and the school.

---

[19] Although Cano testified that the vacuum hose, which remains on throughout the cleaning process, was very loud and would have prevented him from hearing anyone enter the boiler room, the fact remains that the controls were approximately five to ten feet away from where he was positioned and, more importantly, no evidence was presented to suggest that it was an *employee* that had entered the room unnoticed.

[20] The plaintiff's expert testified that a flame could ignite in the boiler in as little as fifteen seconds after a person had activated both the circuit breakers and the emergency switches.

The plaintiff relies on several cases involving jury verdicts upheld by this court on appeal that stand for the general proposition that, even in the absence of direct evidence, a jury may infer the causal connection between a plaintiff's injuries and a defendant's conduct. The plaintiff contends that these cases involve even weaker evidentiary foundations than exists in the present case, thus warranting our affirmance of the jury's verdict. See *Blados* v. *Blados*, 151 Conn. 391, 397, 198 A.2d 213 (1964) (sufficient evidence for jury to conclude that defendant's negligent maintenance of stairway resulted in plaintiff's death); *Foster* v. *Hartford Buick Co.*, 131 Conn. 348, 351, 39 A.2d 884 (1944) (sufficient evidence for jury to infer that employee of defendant had created dangerous condition); *Bradbury* v. *South Norwalk*, 80 Conn. 298, 302, 68 A. 321 (1907) (sufficient evidence for jury to conclude that employee of defendant negligently moved manhole cover). Although the factual predicates in those cases may not always be obvious, suffice it to say that, unlike the present case, each of the cases cited by the plaintiff involved some factual basis to support the jury's inferences, thus establishing the requisite causal connection that is based on more than conjecture and surmise. *Vetre* v. *Keene*, supra, 181 Conn. 140–41; cf. *O'Brien* v. *Cordova*, 171 Conn. 303, 306, 370 A.2d 933 (1976) (insufficient evidence to support jury's inferences; judgment directed for defendant); *McCrorey* v. *Heilpern*, 170 Conn. 220, 222, 365 A.2d 1057 (1976) (same); *Pace* v. *Clark, Hall & Peck*, 167 Conn. 292, 293, 355 A.2d 243 (1974) (same).

The law, therefore, would have allowed the jury to draw any reasonable inferences connecting the defendant's conduct to the plaintiff's injuries, as long as the inferences "rest[ed] upon some basis of definite facts . . . ." *O'Brien* v. *Cordova*, supra, 171 Conn. 305–306. Thus, given the evidence presented, the jury could have concluded that it was cold in the church on the morning

of April 22, 1988. A jury also properly could have concluded that a person who had noticed the cold and was aware of the location and operation of the boilers, but who was unaware that a cleaner was inside one of the boilers, had entered the boiler room and activated the necessary controls. In other words, the jury reasonably could have inferred that, *if* there had been an employee who was aware both of the cold temperature in the church and of how to operate the boilers, but was unaware that someone was inside cleaning boiler number one, that employee likely would have activated the boiler. Because the plaintiff, however, offered no evidence that any employee, other than Hernandez, whom the jury specifically had exonerated, was near the boiler room prior to the accident, was aware of the cold, and was aware of how to activate the boiler, the jury could not have concluded that it was an employee of the defendant who had activated boiler number one without engaging in improper speculation or conjecture.

"Drawing logical deductions and making reasonable inferences from facts in evidence, whether that evidence be oral or circumstantial, is a recognized and proper procedure in determining the rights and obligations of litigants, but to be logical and reasonable they must rest upon some basis of definite facts, and any conclusion reached without such evidential basis is a mere surmise or guess. The gruesome character of the [plaintiff's injuries] naturally tended to create sympathy and a leaning toward a plaintiff's verdict, but for the reasons given we are unable to find in the evidence a sufficient basis for it, and the motion to set it aside should have been granted." *Latham* v. *Hankey*, 117 Conn. 5, 10–11, 166 A. 400 (1933).

The judgment is reversed and the case is remanded to the trial court with direction to grant the defendant's motion for judgment notwithstanding the verdict and render judgment for the defendant.

In this opinion CALLAHAN, C. J., and PALMER, MCDONALD and PETERS, Js., concurred.

PALMER, J., concurring. Upon reconsideration, I am persuaded that the evidence does not support the jury's verdict and, therefore, I join the new majority opinion. I write separately to explain briefly why, despite my original vote to affirm the judgment of the trial court, I now vote to reverse that judgment.

In dissent, Justice Berdon outlines two mutually exclusive scenarios, either one of which, he contends, would support an affirmance of the judgment rendered by the trial court in accordance with the jury verdict. Each scenario is built upon one of the two jury findings of negligence, namely that: (1) the defendant and the defendant's custodian were negligent in failing to deactivate the boiler; and (2) the defendant was negligent in failing to supervise and instruct properly its employees to avoid activating the boiler while it was being cleaned. The evidence adduced at trial, however, does not provide a sufficient basis for the jury reasonably to have found that the defendant's negligence was the legal cause of the plaintiff's injuries. In other words, as the majority concludes, the failure on the part of the plaintiff "to prove an unbroken sequence of events that tie[s] his injuries to the [defendant's conduct]"; *Boehm* v. *Kish*, 201 Conn. 385, 392, 517 A.2d 624 (1986); requires us to set aside the jury verdict.

With respect to the dissent's first scenario,[1] which is predicated on the jury finding that the defendant was

[1] I note, preliminarily, that the first scenario described by the dissent was not raised by the plaintiff until oral argument on the court's reconsideration of the case en banc. Because we ultimately must decide whether the facts adduced at trial, when viewed in the light most favorable to the plaintiff, support the jury's verdict, we are free to consider this, or any other, factual scenario, no matter what stage of the proceedings it is raised. Nevertheless, the fact that the plaintiff failed to advance this scenario prior to the second oral argument in this case suggests that the plaintiff, himself, did not regard it as particularly persuasive.

negligent in failing to deactivate the boiler, the dissent concludes that the jury reasonably could have inferred that the boiler was still on when the plaintiff began his work on the boiler. Consequently, the dissent maintains that the jury reasonably could have found that the defendant was responsible for activating the boiler, whether it was activated by an employee of the defendant or someone else. This argument fails because the uncontroverted testimony of the plaintiff and Osvaldo Cano, the plaintiff's coworker, established that, before the plaintiff started working on the boiler, both the plaintiff and Cano made sure that *all* switches for each of the two boilers,[2] including the circuit breakers, were in the "off" position.[3] Although there is evidence indicating that the switches to the second boiler—the boiler that the plaintiff *did not work on*—had been turned on sometime before the plaintiff and Cano arrived,[4] there simply is no evidence to support the inference that any of the switches to the boiler that the plaintiff *did work on* were in the "on" position when the plaintiff began his work inside that boiler.[5] Consequently, under the dissent's first scenario, the jury would have been required

[2] There were two boilers. The plaintiff, however, only worked on one of them. He did not enter the second boiler.

[3] Of course, "[a] trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible." (Citations omitted.) *Barilla* v. *Blake*, 190 Conn. 631, 639, 461 A.2d 1375 (1983). It is axiomatic, however, that, in rejecting such testimony, a fact finder is not free to conclude that the opposite is true. E.g., *State* v. *Hart*, 221 Conn. 595, 605, 605 A.2d 1366 (1992); *Novak* v. *Anderson*, 178 Conn. 506, 508, 423 A.2d 147 (1979). Thus, although the jury could have disbelieved the testimony of the plaintiff and Cano, in whole or in part, the jury could not have concluded from that testimony that the switches to the boiler in which the plaintiff was working were in the "on" position when the plaintiff and Cano started their work.

[4] The plaintiff and Cano noticed that the second boiler appeared to have been on at some point because it was hot.

[5] Of course, the mere fact that the boiler ignited sometime after the plaintiff entered it proves nothing about the positioning of the switches when the plaintiff and Cano entered the boiler room.

to speculate as to when and how the boiler was activated.[6]

The dissent's second scenario is based upon the factual premise relied upon by the original majority opinion. See generally *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 247 Conn. 24, 31–36, 718 A.2d 425 (1998). Under this scenario, which is predicated on the jury finding that the defendant negligently had failed to instruct its employees to avoid activating the boiler while it was being cleaned, an employee of the defendant activated the boiler while the plaintiff was working on it. After a careful review of the trial record, however, I am persuaded that the new majority is correct in concluding that the evidence is insufficient to support a finding that it is more likely than not that an employee of the defendant activated the boiler while the plaintiff was cleaning it.

My conclusion is based on the following evidence and lack thereof. First, with the exception of Juan Hernandez, the maintenance supervisor, John E. Gilmartin, the pastor of the church, and the priest who celebrated the 12:10 mass (noon mass), there is no evidence that any of the defendant's other employees were in the church at the time of the accident.[7] Consequently, there is no evidence from which it could be inferred that any one of those other employees entered the boiler room

---

[6] It hardly is surprising that there was no evidence to suggest that the switches were in the "on" position when the plaintiff entered the boiler, for it is virtually inconceivable that both Cano and the plaintiff, who were described by their employer, the vice president of Turnpike Furnace, as " '[v]ery good' workers [who were] aware of the company's policy requiring employees to ensure that all switches are off before they begin work on a boiler"; (internal quotation marks omitted) *Paige* v. *St. Andrews Roman Catholic Church Corp.*, 247 Conn. 24, 27–28 n.4, 718 A.2d 425 (1998); would have begun their work without first turning off the boiler.

[7] In addition to Hernandez, the defendant employed three priests, including Gilmartin, three nuns, two janitorial assistants, a housekeeper, a cook and two secretaries.

and activated the boiler while the plaintiff was inside. Of course, the jury reasonably could have inferred that additional heat was necessary to warm up the church for the noon mass, and, furthermore, that Hernandez, Gilmartin and the priest who conducted the noon mass would have known about the mass and the temperature inside the church. There is nothing in the record, however, to support an inference that any of the defendant's other employees were involved in preparing for the noon mass, or that any of them had any other reason to activate the boiler. Moreover, with respect to some of these employees, there is no evidence from which it could be inferred that they even knew where the boiler was located or how to operate it.[8] Absent speculation, it would be impossible to conclude that any one of these other employees activated the boiler.[9]

Hernandez, Gilmartin and the priest who celebrated the noon mass were in the church on the morning of the accident. The jury expressly found, however, that Hernandez did not activate the boiler. Furthermore, the plaintiff makes no claim that Gilmartin turned on the boiler; indeed, Gilmartin's uncontroverted testimony established that he was not in the church at the time of the accident, and the plaintiff adduced no contrary evidence.

---

[8] For example, although it would be reasonable to infer that the two janitorial assistants had some familiarity with the boiler room, there is no reason to draw such an inference with respect to the two priests other than Gilmartin, the three nuns, the housekeeper, the cook and the two secretaries. With regard to the janitorial assistants, Hernandez testified, without contradiction, that they were with him at lunch, when the accident occurred. Moreover, there was no evidence placing the janitorial assistants at the scene when the accident occurred.

[9] In view of the paucity of evidence relating to the activation of the boiler, it also would require speculation to conclude that someone other than an employee of the defendant, such as a parishioner or officious intermeddler, had ignited the boiler. This fact does not aid the plaintiff, however, for he, not the defendant, bore the burden of removing his claim from the realm of speculation.

As for the priest who celebrated the noon mass, the jury reasonably could have inferred that, when he arrived at the church, he found it to be uncomfortably cool. The accident occurred at 11 a.m., however, and there was no testimony placing the priest in the church prior to the noon mass. Consequently, in order to conclude that the priest activated the boiler, it also must be inferred that the priest arrived at the church more than an hour early to prepare for the mass. Assuming that this latter inference is a fair one, there is no evidence tending to establish that the priest knew how to activate the boiler, or even that he knew where the boiler room was located. Absent *any* evidence linking the priest to the boiler, the jury reasonably could not have concluded that the priest activated it. In other words, the jury could not have found that it was more likely than not that the priest activated the boiler based solely on the subordinate finding that he knew that the church was uncomfortably cool.[10]

Writing for the original majority, Justice Berdon sought to make the necessary connection between the priest and the boiler, as follows: "Clearly, the three priests who worked for the defendant at the time of the accident—*each of whom possessed keys to the boiler room—knew where to find the boiler and how to activate it.*" (Emphasis added.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 32 n.10. If this critical factual assertion were accurate, as I mistakenly believed it to be, it would have permitted the inference that the priest who celebrated the noon mass had knowledge of where the boiler was located and how to operate it—an inference that would have provided the link necessary to connect the priest to the boiler room and remove that aspect of the plaintiff's

---

[10] Undoubtedly, it is for this reason that the plaintiff never asserted that the priest who celebrated the noon mass was responsible for activating the boiler.

case from the realm of speculation. Under such a factual scenario, therefore, the original majority reasonably could have concluded that the evidence, although close; see id., 31 (acknowledging that "this is a close case"); was sufficient to support a finding that it was more likely than not that the priest had activated the boiler. As the defendant pointed out in its motion for reconsideration en banc, and as a careful reexamination of the entire record bears out, however, *there is no evidence, whatsoever, establishing that the priest who performed the noon mass possessed a key to the boiler room.* On the contrary, the evidence adduced at trial indicated *that only Gilmartin and Hernandez possessed keys to the boiler room.*[11] Absent any testimony from which it could be inferred that the priest who celebrated the noon mass knew how to activate the boiler, or even that he knew where the boiler was located, the jury reasonably could not have concluded that it was more likely than not that he had activated the boiler while the plaintiff was working on it.[12]

One can take no pleasure in denying a seriously injured plaintiff compensation for his injuries. Nevertheless, because our system of justice requires that we strive to apply our laws in an objective, impartial and evenhanded manner, where, as here, the facts, viewed most favorably to sustaining the jury verdict, do not support that verdict, we are duty bound to do so. Accordingly, upon reconsideration of my original vote, I concur with and join the new majority opinion.[13]

[11] Specifically, Hernandez testified that only he and Gilmartin had keys to the boiler room. Gilmartin testified that he did not know whether anyone else had a key.

[12] This factual lacuna aside, it is difficult to imagine that the priest who celebrated the noon mass walked into the lighted boiler room at approximately 11 a.m., saw Cano standing near the boiler, proceeded to activate the boiler, and then failed to respond when, seconds later, the boiler ignited, causing the emergency situation that resulted in the grievous injuries to the plaintiff.

[13] As is frequently his practice, Justice Berdon characterizes the opinions of those with whom he disagrees in disparaging and provocative terms. I,

BERDON, J., dissenting. I continue to adhere to the views that I expressed in the original majority opinion in this case, which was released last September. *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 247 Conn. 24, 718 A.2d 425 (1998). I write once again in order to underscore the weakness of the new majority opinion.

The African-American plaintiff, Thelonious Paige, sustained extensive injuries when a large boiler in the basement of a church owned by the defendant St. Andrew's Roman Catholic Church Corporation (defendant) was activated while the plaintiff was cleaning it from the inside. As a result of this incident, "the plaintiff suffered third and fourth degree burns over two thirds of his body; portions of his legs and ankles were burned to the bone. Ten years later, the plaintiff remains severely scarred. Following his injury, the plaintiff brought this negligence action against the defendant." Id., 25–26.

The jury found that the defendant was negligent in each of the following ways: (1) "[f]ailing to deactivate the boiler in which [the plaintiff] was injured" and (2) "[f]ailing to supervise its employees, servants, and agents and failing to instruct them to avoid activating the burner or boiler while [the plaintiff] was cleaning the boiler." Moreover, the jury found that "[t]he defendant's custodian, in spite of assuring [the plaintiff] that the boiler and burner had been deactivated, [negligently] failed to properly deactivate the boiler and burner."[1] Based upon these findings, the jury concluded that the defendant's negligence "was . . . at least one proximate cause of (a substantial factor causing) the injuries to [the plaintiff]," and awarded the plaintiff damages

like the other members of the majority, refuse to engage Justice Berdon in kind.

[1] See appendix A of this dissent for the jury's findings as set forth in its answers to the interrogatories.

in the approximate amount of $3.2 million.[2] The trial court declined to set this verdict aside and rendered judgment for the plaintiff in accordance with the verdict.

"The concurrence of the judgments of the [trial] judge and the jury who saw the witnesses and heard the testimony is a powerful argument for upholding the verdict. *Lopez* v. *Price*, 145 Conn. 560, 564, 145 A.2d 127 (1958); accord *Fink* v. *Golenbock*, 238 Conn. 183, 207–208, 680 A.2d 1243 (1996); *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 610, 662 A.2d 753 (1995); *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988). Furthermore, it is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, *in the light most favorable to sustaining the verdict*, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . *Purzycki* v. *Fairfield*, 244 Conn. 101, 112–13, 708 A.2d 934 (1998). In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . *Fink* v. *Golenbock*, supra, 208. In other words, [i]f the jury *could* reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it. . . . *Donner* v. *Kearse*, 234 Conn. 660, 681, 662 A.2d 1269 (1995); see *Trzcinski* v. *Richey*, 190 Conn. 285, 298, 460 A.2d 1269 (1983).

"Three further points bear emphasis. First, it is fundamental that, in a civil case, the plaintiff is not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, jurors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them

---

[2] See appendix A of this dissent.

to the evidence or facts in hand . . . . *Purzycki* v. *Fairfield*, supra, 244 Conn. 113. Third, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury. Id., 112." (Emphasis in original; internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 30–31.

In the opinion released last September, three justices on the five member panel (*Berdon, Norcott* and *Palmer, Js.*) concluded that the verdict must be sustained on the following ground: "the jury reasonably could have concluded that the defendant's negligence in failing to properly supervise its employees was causally connected to the plaintiff's injuries . . . ." Id., 27 n.3. Because we deemed this rationale a sufficient basis upon which to affirm the work of the jury and the trial court, we declined to "address the defendant's claims with respect to the causal connections between the jury's other findings of negligence and the plaintiff's injuries." Id. During the second round of oral arguments in this case, the plaintiff presented an alternative ground for affirmance that was based upon the remaining two specifications of negligence contained in the jury interrogatories. Although the author of the new majority opinion extensively questioned the plaintiff's counsel concerning this argument, the majority opinion does not so much as mention it. In part I of this dissent, I discuss this alternative ground for affirmance. In part II, I revisit the grounds upon which three justices of this court originally affirmed the judgment last year.

I

At oral argument before an en banc panel of this court, plaintiff's counsel emphasized two of the jury's findings: (1) the defendant "[failed] to deactivate the boiler in which [the plaintiff] was injured" and (2) "[t]he

defendant's custodian, in spite of assuring [the plaintiff] that the boiler and burner had been deactivated, [negligently] failed to properly deactivate the boiler and burner."

When viewed in the light most favorable to the plaintiff, it is apparent that the evidence supports these findings. In order to deactivate the boiler and thereby render the burner inoperable, it was necessary that an emergency switch and three circuit breakers all be in the "off" position.[3] The plaintiff's employer instructed the defendant to deactivate the boilers the night before the accident, so that they would be sufficiently cool the next morning to permit the workers to enter and clean them. Juan Hernandez, a custodian for the defendant, claimed that he turned off the requisite switches and locked the door to the boiler room at approximately 5 o'clock in the afternoon preceding the accident. The following morning, however, the door was unlocked. The jury reasonably could have credited Hernandez' testimony that only he and another of the defendant's employees—the church pastor—had access to the keys to the boiler room.[4] In addition, the plaintiff and Osvaldo Cano—the on-site supervisor employed by the plaintiff's company—found that one of the boilers was hot to the touch and glowed fluorescent orange when they arrived. According to the plaintiff's expert, this meant that the boiler had been in operation within the previous several hours. There is thus more than sufficient evidence to support the jury's findings that the defendant "[failed] to deactivate the boiler in which [the plaintiff] was injured" and, more specifically, that Hernandez, "in spite of assuring [the plaintiff] that the boiler and burner had been deactivated, failed to properly deactivate [them]."

---

[3] All of these switches were located in the defendant's boiler room.

[4] As the concurrence observes, "Hernandez testified that only he and Gilmartin had keys to the boiler room. Gilmartin testified that he did not know whether anyone else had a key."

Based upon these findings and the undisputed fact that the boiler could not have ignited if it had been deactivated while the plaintiff was cleaning it, the jury reasonably could have determined that the defendant was negligent. For the reasons that I have just discussed, the jury reasonably could have found that all of the requisite switches were in the "on" position on the morning of the accident.[5] Furthermore, the jury reasonably could have determined that the plaintiff and Cano either: (1) (a) believed Hernandez when he told them that the boiler was deactivated and (b) did not independently verify that all of the switches were off; or (2) (a) checked the switches to make certain that they were off and (b) mistakenly concluded that they were.[6] In addition, the jury reasonably could have determined that either or both of these scenarios was sufficiently foreseeable that the defendant acted negligently

[5] There are two remaining permutations: (1) some of the switches were in the "on" position and some were in the "off" position; and (2) all of the switches were in the "off" position. For a discussion of both of these scenarios, see part II of this dissent.

[6] In his concurring opinion, Justice Palmer places heavy emphasis upon "the uncontroverted testimony of the plaintiff and [Cano] . . . that, before the plaintiff started working on the boiler . . . all switches . . . were in the 'off' position." Justice Palmer appears to misunderstand a fundamental evidentiary principle. "A trier of fact is free to reject testimony even if it is uncontradicted; State v. Dudla, 190 Conn. 1, 7, 458 A.2d 682 (1983); Stanton v. Grigley, 177 Conn. 558, 563, 418 A.2d 923 (1979); Taylor v. Corkey, 142 Conn. 150, 154, 111 A.2d 925 (1955); and is equally free to reject part of the testimony of a witness even if other parts have been found credible. Griffin v. Nationwide Moving & Storage Co., 187 Conn. 405, 422, 446 A.2d 799 (1982); Raia v. Topehius, 165 Conn. 231, 235, 332 A.2d 93 (1973)." Barrila v. Blake, 190 Conn. 631, 639, 461 A.2d 1375 (1983). This principle finds its roots in the very simple premise that a witness' testimony may well be either untruthful or empirically incorrect, even if no other witness has sufficient knowledge to say so. As for Justice Palmer's claim that "there simply is no evidence [apart from the testimony of the plaintiff and Cano] to support the inference that any of the switches to the boiler . . . were in the 'on' position when the plaintiff began his work," I refer the reader to the undisputed fact that the boiler ignited, an occurrence that would have been physically impossible if the boiler had been off.

by failing to follow the express instructions to deactivate the boiler.

With these premises in place, it becomes perfectly clear that the jury reasonably could have reached the following conclusions: (1) the defendant was negligent because Hernandez failed to deactivate the boiler; and (2) this negligence was a proximate cause of the plaintiff's injuries. It is undisputed that, if the defendant had properly deactivated the boiler, it would not have been capable of igniting. Because the defendant negligently failed to deactivate the boiler, the boiler ignited.[7] The defendant's negligence was thus a proximate cause of the plaintiff's grievous injuries.

This scenario makes perfect sense in light of the jury's other findings. In addition to finding that the defendant's negligence proximately caused the plaintiff's injuries, the jury also found that the plaintiff was contributorily negligent in the amount of 35 percent.[8] In its answer to the plaintiff's complaint, the defendant proffered the following special defense: "The plaintiff was himself negligent and careless in at least one, if not more than one, of the following respects, in that . . . he failed to insure that the [relevant] boiler was deactivated prior to entering same . . . he failed to undertake and follow proper procedures to insure that the boiler he was cleaning would not ignite . . . he failed to conduct the proper investigation prior to entering the boiler to insure that the boiler would not ignite . . . he entered the boiler and attempted to clean same

---

[7] Assuming that all of the switches were in the "on" position; see footnote 5 of this dissent; a sufficiently high thermostat setting would have triggered the ignition of the boiler without the intervention of any human act. If even one of the switches was in the "off" position, then someone would have had to enter the boiler room in order to activate the boiler. For a discussion of this scenario, see part II of this dissent.

[8] Accordingly, the jury deducted $1,712,563.02 from the plaintiff's combined economic and noneconomic damages of $4,893,037.21. See appendix A of this dissent.

without insuring that it was safe to do so . . . [and] he failed to take the proper precautions necessary to insure his own safety prior to and while engaged in cleaning said boiler . . . ." This finding dovetails seamlessly with the jury's determination that the defendant negligently "[failed] to deactivate the boiler in which [the plaintiff] was injured."

It is thus apparent that the jury reasonably could have determined (1) that the defendant was negligent because it failed to deactivate the boiler, (2) that the plaintiff was contributorily negligent because he failed to ensure that the boiler had been properly deactivated, and (3) that the combined effect of these two failures proximately caused the plaintiff's injuries. Accordingly, we must uphold the work of the jury and the trial court in this case.

## II

In the opinion that we released last September, a majority of the five member panel began from a different set of premises. Most importantly, we explained that the jury reasonably could have concluded that "[a]ll four switches were in the 'off' position when the plaintiff entered the boiler."[9] *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 27. Correlatively, we explained that "[t]he boiler in which the plaintiff was injured could not have ignited unless someone

---

[9] "The plaintiff and Cano both testified to this fact." *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 27 n.4. I recognize that the foundational premise of this argument and the foundational premise of part I of this dissent are mutually exclusive. See footnote 5 of this dissent. Because we cannot ascertain what, precisely, the jurors were actually thinking, this approach is necessary to cover every possibility. In my view, the work of the jury and the trial court must be sustained under any of the various permutations.

activated both the emergency switch and the three circuit breakers."[10] Id., 28.

Starting from these premises, we relied upon the following reasoning in order to uphold the work of the jury and the trial court: "[T]he defendant . . . failed to provide *any* supervision, instructions or warnings whatsoever to any of its employees that they were not to activate the boiler. Moreover, the defendant concedes—as it must—that, if the jury reasonably could have concluded that an employee activated the boiler, the defendant's failure to instruct its employees not to activate the boiler was a proximate cause of the plaintiff's injuries.[11] In other words, if the jury reasonably could have found that an employee activated the boiler, the defendant concedes negligence and causation, and therefore liability. . . .

"The jury's determination [that it was more probable than not that an employee activated the boiler][12] is supported by focusing upon two consecutive and interrelated inquiries: (1) Who possessed the ability to activate

[10] If any of the switches were in the "off" position when the plaintiff entered the boiler, it follows that someone would have had to enter the boiler room and flip the switch(es) to the "on" position before the boiler would be capable of igniting.

[11] In its answer to the plaintiff's complaint, the defendant proffered the following special defense, which dovetails perfectly with this latter theory of causation: "The plaintiff was himself negligent and careless in at least one, if not more than one, of the following respects, in that . . . he failed to take the proper precautions necessary to insure his own safety prior to and while engaged in cleaning [the] boiler . . . [and] he failed to adequately control access to the controls which could activate the boiler while he was cleaning same . . . ."

[12] As discussed previously, the jury found that the defendant negligently "[failed] to supervise its employees, servants, and agents and [failed] to instruct them to avoid activating the burner or boiler while [the plaintiff] was cleaning [it]." See appendix A of this dissent. At first glance, it may appear as if this finding is mutually exclusive with the finding that the defendant negligently failed to deactivate the boiler. It is not. There are two different ways to reconcile these findings. First, the jury reasonably could have determined that the defendant negligently left all of the requisite switches in the "on" position, thereby creating a situation in which the

the boiler? and (2) Of those people, who possessed the incentive to do so? We conclude that the jury reasonably could have determined that only [employees of the defendant] possessed sufficient ability to activate the boiler, and that they also possessed ample incentive to do so.

"First, it is apparent that employees of the defendant possessed the ability to activate the boiler. [Numerous] employees were within easy walking distance of the boiler room; some of them would not even have had to exit the building in which they worked in order to do so.[13] Moreover, the jury reasonably could have concluded that several of these employees knew both where the boiler room was located and how to activate the boiler.

"Second, it is equally apparent that those employees possessed ample incentive to ignite the boiler. On the morning of [the accident], the weather was between ten and twenty degrees above freezing. On the basis of

setting on the thermostat triggered the ignition of the boiler without the intervention of any human act. Accordingly, the jury reasonably could have concluded that the defendant's negligent failure to instruct its employees to avoid activating the boiler was not a proximate cause of the plaintiff's injuries. This is the scenario that I discuss in part I of this dissent. Alternatively, the jury reasonably could have determined that: (1) the defendant, the plaintiff and Cano collectively deactivated the boiler by leaving at least one of the relevant switches in the "off" position; and (2) an employee of the defendant's entered the boiler room and reactivated the boiler by turning the requisite switch(es) to the "on" position.

[13] In addition to Hernandez (whom the jury exculpated of affirmatively activating the boiler), the defendant employed three priests, three nuns, two janitorial assistants, a housekeeper, a cook, and two secretaries. *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 24, 29. The jury reasonably could have concluded that these employees came to work on the morning that the plaintiff was injured.

The majority has identified nine additional employees of the defendant: eight lay teachers and one school principal. Because school was not in session on the morning that the plaintiff was injured, I assume for the sake of argument that the jury did not consider the possibility that one of these employees activated the boiler.

this evidence, the jury could have concluded that one of the employees working in the complex served by the boiler was uncomfortably cold and that he or she activated the boiler in order to heat the building. In addition, a mass was scheduled at the church for 12:10 p.m. [that day]. The jury could have found that an employee wanted to make the church comfortable for parishioners,[14] and that, because the church requires a sufficient length of time to warm up, it was necessary for the employee to activate the boiler approximately one hour prior to the commencement of the mass. . . .

"On appeal, the defendant posits a number of exculpatory speculations, which it denominates 'plausible hypotheses.' Although they may be plausible, they do not preclude the jury from reasonably having found that the person who ignited the boiler was, more probably than not, an employee of the defendant. See *Duley* v. *Plourde*, 170 Conn. 482, 486, 365 A.2d 1148 (1976) (' "[p]roof of a material fact by inference need not be so conclusive as to exclude every other hypothesis" '). In other words, the jury reasonably could have concluded that only persons employed by the defendant possessed the ability and incentive to ignite the boiler.

"The only other individuals who could have activated the boiler fall into two categories: parishioners and strangers off the street. There is no evidence that indicates that either a parishioner or a stranger was anywhere near the defendant's boiler room at the time the boiler was activated.

"John E. Gilmartin, the pastor at the church, testified that all the parishioners who attended the 7 a.m. mass

---

[14] The new majority implies that the cook, the housekeeper, and the secretaries possessed no incentive to activate the boiler because the resultant heat would not have entered their personal work space. This implication disregards the possibility that one of these four employees may have turned the boiler on in order to supply heat for the upcoming mass.

left shortly after it ended at 7:25, and there was no evidence that any parishioner arrived early for the 12:10 mass. Moreover, in order to activate the boiler at or near 11 a.m., the approximate time the accident occurred, a parishioner would have had to either linger for more than three hours after the morning mass had ended or arrive approximately one hour before the 12:10 mass began. At trial, the defendant was unable to account for any parishioner's presence in the church during either of these intervals. For these reasons, the jury reasonably could have concluded that no parishioners were inside the church at the time the boiler ignited.

"Even if a parishioner had been in the church for some reason at the requisite time, no evidence was presented to support the defendant's assumption that someone not employed by the defendant was permitted to enter the boiler room, knew where the boiler room was, or knew how to activate an industrial boiler. Thus, the jury reasonably could have concluded that it was less probable than not that a parishioner ignited the boiler.

"The highly speculative nature of this string of suppositions increases geometrically when applied to strangers off the street. Again, the defendant has introduced no evidence that any stranger was present in either the church or the boiler room on the morning of [the accident]. Accordingly, the jury reasonably could have concluded that no such person was inside the church when the boiler ignited.[15]

---

[15] "The jury reasonably could have rejected the defendant's alternative suggestion that 'an enemy' of the plaintiff activated the boiler. In order to conjure up the facts required to support this self-proclaimed 'plausible hypothesis'—that the plaintiff had an enemy, that the enemy was homicidal, that the enemy knew the plaintiff's work schedule, that the enemy could find the boiler room, that the enemy knew how to operate a boiler, and that the enemy planned a grisly murder that would require him to pass undetected in and out of a church occupied by [numerous] people—requires a process of extrapolation that does not find support in the record." *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 35 n.13.

"Because the jury reasonably could have concluded that neither parishioners nor strangers were anywhere near the boiler on the morning of [the accident], it is unnecessary to address their incentive to do so.

"For all of these reasons, the jury reasonably could have concluded, on the basis of the following findings of fact and inferences drawn from the trial testimony, that it was more probable than not that an employee of the defendant activated the boiler: (1) some person activated the boiler; (2) that person was not the plaintiff, Cano or either of the [two] painters [who were working on the defendant's premises that day];[16] (3) that person was not a parishioner; (4) that person was not a stranger off the street; (5) [numerous] employees of the defendant were within easy walking distance of the boiler; and (6) these employees possessed both the ability and the incentive to ignite the boiler.

"Because of the concurrence of both the jury's verdict and the trial court's refusal to set aside the verdict, and viewing the evidence in the light most favorable to sustaining the verdict, we are persuaded that there was sufficient evidence in the record to support the jury's finding of the defendant's liability by a fair preponderance of the evidence." (Emphasis in original.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 29–36.

---

[16] It would have been physically impossible for the plaintiff—who was trapped inside the boiler—to have activated the relevant switches (which were, of course, not located on the inside of the boiler). "The jury reasonably could have credited the unambiguous and unimpeached testimony of Cano that he did not activate the boiler. Moreover, the jury reasonably could have credited the unambiguous and unimpeached testimony of Carl A. Coletta, the head painter in the church hall, that he and his partner did not touch the emergency switch or circuit breaker switches. See *Lopez* v. *Price*, 145 Conn. 560, 564, 145 A.2d 127 (1958) (credibility determinations fall within traditional province of jury)." *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 29 n.6.

The members of the new majority have not supplied any reason to question the viability of the analytic framework that three justices of this court set forth last September. Nor have they supplied any reason to question either our threshold premises or the conclusions derived therefrom.[17] Instead, the only way that the new majority can justify reversal of the original majority opinion is by disregarding our extraordinarily deferential standard of review.[18]

I am troubled by the paucity of principled argument that appears in the new majority opinion. As I read the opinion, the new majority has suggested only four reasons to overrule the opinion that we released last

[17] More specifically, the new majority fails to supply any reason to believe: (1) that the plaintiff, Cano, or either of the painters activated the boiler; (2) (a) that any parishioner was in the church at the appropriate time and (b) that such a hypothetical parishioner had the ability to activate the boiler (i.e., was permitted to do so, knew where the boiler room was located, and knew how to activate an industrial boiler); (3) (a) that a stranger off the street was in the church at the appropriate time and (b) that such a stranger had either the ability or the incentive to activate the boiler; (4) that not one employee of the defendant's possessed both the ability and the incentive to activate the boiler; or (5) that anyone other than an employee, parishioner, or a stranger off the street had either the ability or an incentive to activate the boiler. When viewed alongside our highly deferential standard of review, this failure is fatal to the position adopted by the members of the new majority.

In three separate parts of his concurring opinion, Justice Palmer emphasizes that, "with respect to some of [the defendant's] employees, there is no evidence from which it could be inferred that they even knew where the boiler was located or how to operate it. Absent speculation, it would be impossible to conclude that any one of these . . . employees activated the boiler." Intriguingly enough, Justice Palmer neglects to mention an obvious corollary to this evidentiary lacuna: the persuasive force of his argument increases geometrically when it is applied to either parishioners or strangers off the street.

[18] The new majority suggests, for example, that the jury may have determined that one of the painters activated the boiler. Although it is possible to hypothesize that the jury disregarded the unambiguous and unimpeached testimony of the head painter that neither he nor his partner activated the boiler, this hypothesis disintegrates when viewed in the light most favorable to the plaintiff.

September. In my view, none of these reasons justifies overturning the work of the jury, the trial court, and three justices of this court.

First, the majority emphasizes the jury's finding that Hernandez, the defendant's custodian, did not affirmatively activate the boiler.[19] This emphasis can only avail the majority if it distracts attention away from the factual finding that lies at the heart of the jury's determination that the defendant "[failed] to supervise its employees, servants, and agents and [failed] to instruct them to avoid activating the burner or boiler while [the plaintiff] was cleaning the boiler": one of the defendant's employees activated the boiler. Because there were numerous employees other than Hernandez who had both the ability and the incentive to activate the boiler, the jury's finding that Hernandez was not the employee who did so is of no moment.

One of these other employees was the priest responsible for the 12:10 p.m. mass (which was scheduled to commence one hour after the boiler ignited). The jury reasonably could have concluded that it was more likely than not that this priest was the employee who activated the boiler. This conclusion finds compelling support in the following facts: it was a cold day, it was necessary to activate the boiler early enough that it would supply heat for the mass, and the boiler ignited approximately one hour before the mass was scheduled to commence. Because this priest presided over the mass, it would have been both logical and reasonable for the jury to have drawn the inference[20] that—because he had both

---

[19] To avoid any possible confusion on this point, I wish to reiterate that the jury also determined that Hernandez, "in spite of assuring [the plaintiff] that the boiler and burner had been deactivated, failed to properly deactivate the boiler and burner." See appendix A of this dissent.

[20] Even in the context of a criminal case—where the stakes are high and the state must prove its case beyond a reasonable doubt—the jury is entitled to rely upon an inference that the defendant is guilty and reject evidence that would support an acquittal. See, e.g., State v. Dumlao, 3 Conn. App. 607, 616, 491 A.2d 404 (1985) ("in viewing evidence which could yield contrary

the ability and a strong incentive to activate the boiler—he was, in fact, the employee who did so.

Second, the majority claims that "[i]t would require . . . creative reasoning to conclude" that one of the employees who worked in the rectory ignited the boiler. In fact, "[t]he rectory is so close to the complex [where the plaintiff was injured] that a painter working in the church hall went to the rectory to call 911 after learning of the plaintiff's injuries." *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 28. Although the majority is correct that "[a]ny chill in the rectory . . . would not be remedied" by activating the boiler in which the plaintiff was injured, this does not alter the fact that—as agents of the defendant—the employees who worked in the rectory possessed ample incentive to turn the boiler on for the comfort of the parishioners who would be arriving later in the day to attend the 12:10 mass.

Third, the majority speculates that one of the painters might have ignited the boiler. As discussed in footnote 16 of this dissent, the jury reasonably could have credited the unambiguous and unimpeached testimony of Carl A. Coletta, the head painter in the church hall, that neither he nor his partner touched the emergency switch or the circuit breaker switches. Moreover, the majority's speculation is highly irrational. As the majority concedes, the boiler in which the plaintiff was injured supplied no heat to the part of the complex where the painters were working. Accordingly, the painters would have had no incentive to activate the boiler, even if they had known how to do so.

Fourth, the majority claims that "[i]t would be pure conjecture . . . to conclude that [someone] . . .

inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence").

entered the boiler room while Cano was assisting the plaintiff without Cano even realizing that someone had entered the room . . . [and then] left the boiler room, without ever having been noticed by Cano . . . ." Nevertheless, the majority assumes in two separate parts of its opinion that "the only way that the [boiler] could have ignited while the plaintiff was inside cleaning [it] would be if someone had entered the boiler room and had activated both the circuit breakers and the emergency switches."[21] The majority does not deny that the boiler did, in fact, ignite. Accordingly, I am unable to appreciate the "conjecture" that the majority claims is required in order to support the factual finding that the majority itself characterizes as "the only way" that the accident could have happened.

Within a remarkably short period of time after the panel in this appeal was expanded to include Justice Borden and Senior Justice Peters, Justice Palmer's perspective on this case rotated 180 degrees. Last September, he agreed with the jury, the trial court, and me; today he does not. Because I believe that neither the new majority opinion nor the concurrence has managed to marshal a persuasive argument, I am unable to comprehend what has prompted Justice Palmer to abandon his published views by joining the opinion that Justice Borden has written. According to his concurring opinion, Justice Palmer has had a change of heart because what he calls a "critical factual assertion" in the original majority opinion has turned out to be mistaken. More specifically, Justice Palmer claims that he feels compelled to switch his vote because *"there is no evidence, whatsoever, establishing that the priest who performed*

---

[21] This concession begins from the premise that the jury determined that at least one of the requisite switches was in the "off" position when the plaintiff entered the boiler. See part I of this dissent for a discussion of the defendant's liability if the jury determined that all of the switches were in the "on" position when the plaintiff entered the boiler.

*the noon mass possessed a key to the boiler room.* On the contrary, the evidence adduced at trial indicated that *only Gilmartin and Hernandez possessed keys to the boiler room.*" (Emphasis in original.) Looking beyond Justice Palmer's profligate use of italics, it does not make a whit of difference who had keys to the boiler room.[22] It is undisputed that the door to the boiler room was propped open while the plaintiff was cleaning the boiler. Accordingly, no key was necessary to obtain access to the controls in the boiler room. Furthermore, Justice Palmer's claim that the employees who worked in the church complex—many of whom also lived there—did not know where the boiler room was located defies common sense.[23]

Moreover, Justice Palmer's argument contradicts a central premise of the majority opinion that he joined last September: "[I]t is apparent that employees of the defendant possessed the ability to activate the boiler," even though most of these employees did *not* have keys to the (propped open) door to the boiler room.[24] *Paige*

---

[22] To be perfectly clear on this point, it does not make a whit of difference within the context of Justice Palmer's attempt to refute the argument that I have set forth in part II of this dissent. If Justice Palmer's recitation of the facts sounds familiar, it is because I cited it for the entirely different, alternative argument that I have set forth in part I of this dissent. See footnote 4 of this dissent and the accompanying text.

[23] If he wishes to be more consistent with his logic than he has been with his votes, Justice Palmer must also believe that the jury could not reasonably have concluded that the defendant's employees knew where the doors, closets, and bathrooms were located in the church complex. After all, there was no testimony suggesting either that any employee knew where these places were or that any employee had the requisite keys to doors that are often left unlocked.

[24] More fully, Justice Palmer, by joining the original majority, concurred with the following passage: "[I]t is apparent that employees of the defendant possessed the ability to activate the boiler. [Numerous] employees were within easy walking distance of the boiler room; some of them would not even have had to exit the building in which they worked in order to do so. Moreover, the jury reasonably could have concluded that several of these employees knew both where the boiler room was located and how to activate the boiler." *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 32.

v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 32. It is as obvious to me now as it was last September that the jury reasonably could have determined that the defendant's employees knew where in their building the boiler room was located, even though they did not all have keys. I am unable to comprehend why Justice Palmer has decided to reject this seemingly obvious proposition, one which he so recently endorsed.

Finally, if Justice Palmer had genuinely believed last September that this entire case pivoted upon the fulcrum of whether or not a single employee had a key to a door that was propped open at all relevant times, Justice Palmer should have independently verified the relevant citations to the trial transcript that I included in the draft majority opinion that I circulated to the first panel that heard this case. His failure to do so last September strongly suggests that he recognized that the zen-like detail of who had keys to an unlocked door is barely relevant, let alone dispositive. In short, Justice Palmer has got to come up with something better than this if he wishes to justify his decision to jump ship by joining the opinion that Justice Borden has written.

It is not always easy to demarcate the boundary between a conjecture and an inference. Both concepts represent points along a continuum, and whether a given conclusion rises to the level of a legitimate inference is often a matter of nuance and judgment. As we readily acknowledged in the original majority opinion, this was a close case. Id., 31. Now, nine months later, the new majority has failed to reckon with the heavy burden established by our extraordinarily deferential standard of review, which creates a presumption that we must sustain the work of the jury and the trial judge. In order to prevail on appeal, the plaintiff was not required to convince us beyond a reasonable doubt.

Instead, he merely had to demonstrate that—giving the evidence the most favorable construction of which it is reasonably capable—a rational jury somehow could have found it more likely than not that he was entitled to recover for his grievous injuries. Neither the new majority opinion nor the concurrence contains anything that shakes my conviction that the plaintiff has satisfied this standard.[25]

Accordingly, I dissent.

APPENDIX A

"JURY INTERROGATORIES

1. Was the defendant, ST. ANDREW'S ROMAN CATH-OLIC CHURCH CORPORATION, or its agents, servants, or employees, negligent in any of the following ways (please respond to each item)?

(a) Failing to deactivate the boiler in which Thelonious Paige was injured.        YES _X_ NO ____

(b) Failing to see to it that the boiler in which Thelonious Paige was burned remained inoperable while he was in the process of cleaning it.
                                        YES ____ NO _X_

(c) Failing to adequately control access to the boiler controls, thermostats and all other controls which could activate the burner while Thelonious Paige was cleaning the boiler.                        YES ____ NO _X_

---

[25] In a footnote appended to the final word of his concurring opinion, Justice Palmer writes that, "[a]s is frequently his practice, Justice Berdon characterizes the opinions of those with whom he disagrees in disparaging and provocative terms. I . . . refuse to engage Justice Berdon in kind." Looking past the ad hominem disparagement contained in this provocative footnote, my only response is that I carefully calibrate my rhetoric—here, as elsewhere—in order to convey the intensity of my beliefs. In my view, this is a fundamental aspect of my judicial duties.

(d) Failing to supervise its employees, servants, and agents and failing to instruct them to avoid activating the burner or boiler while Thelonious Paige was cleaning the boiler. YES _X_ NO ____

(e) Failing adequately to inspect the burner, boiler, electrical system, and control mechanisms before Thelonious Paige entered the boiler to ensure that they had placed the burner in an inoperable condition while Thelonious Paige was cleaning the boiler.
YES ____ NO _X_

(f) The defendant's custodian, who assured Thelonious Paige that the boiler would remain deactivated, negligently activated a control causing the burner to ignite. YES ____ NO _X_

(g) The defendant's custodian, in spite of assuring Thelonious Paige that the boiler and burner had been deactivated, failed to properly deactivate the boiler and burner. YES _X_ NO ____

(h) Failing to take or cause to be taken preventive measures to eliminate the exposure of others to probable injuries which the defendant knew or should have known would occur in the performance of the work of cleaning the boilers at St. Andrews Parish.
YES ____ NO _X_

NOTE: If you answer 'No' to all of the items in question 1, you have reached a defendant's verdict for ST. ANDREW'S ROMAN CATHOLIC CHURCH CORPORATION. Please report that you have completed your deliberations.

If you answer 'Yes' to any of the items in question 1, continue to question 2.

2. If you found that the defendant, ST. ANDREW'S ROMAN CATHOLIC CHURCH CORPORATION, or of its agents, servants, or employees, were negligent, was

that negligence at least one proximate cause of (a substantial factor causing) the injuries to Thelonious Paige?

YES _X_ NO ____

NOTE: If you answer 'No' to question 2, you have reached a defendant's verdict for ST. ANDREW'S ROMAN CATHOLIC CHURCH CORPORATION. Please report that you have completed your deliberations. If you answer 'Yes,' please continue to question 3.

3. Was THELONIOUS PAIGE negligent on April 22, 1988?

YES _X_ NO ____

NOTE: If you answer 'Yes' to question 3, continue to question 4. If you answer 'No' to question 3, go to question 5.

4. If you found [that] THELONIOUS PAIGE was negligent, was that negligence at least one proximate cause of (substantial factor causing) the injuries to Thelonious Paige?

YES _X_ NO ____

5. What is the percentage of negligence of each party?

NOTE: If you have answered 'No' to either question 3 or question 4, then the percentage of negligence of Thelonious Paige must be zero percent.

| | |
|---|---|
| St. Andrew's Roman Catholic Church Corporation | 65% |
| Thelonious Paige | 35% |
| TOTAL | 100% |

NOTE: If the percentage of negligence which you assign to Thelonious Paige is less than or equal to 50 percent, continue to question 6. If the percentage of negligence which you assign to Thelonious Paige is

greater than 50 percent, please report that you have finished your deliberations. Your verdict will be a verdict for the defendant and you may not award damages to Thelonious Paige.

6. What is the amount of damages suffered by Thelonious Paige as a result of the incident of April 22, 1988?

Fill in the amounts you wish to award:

Amount of Damages

Economic Damages

| | |
|---|---|
| Past care needs, medical & related expenses | $ 262,000.00 |
| Future medical, hospital surgical, and rehabilitative care and expenses | $1,333,000.00 |
| Past lost wages | $ 194,205.21 |
| Future loss of earning capacity | $1,200,000.00 |

Non-Economic Damages

| | |
|---|---|
| Past pain & suffering | $ 541,666.00 |
| Future pain & suffering | $ 333,000.00 |
| Past loss of enjoyment of life's activities | $ 362,500.00 |
| Future loss of enjoyment of life's activities | $ 666,666.00 |
| TOTAL DAMAGES: | $4,893,037.21 |

7. CALCULATING AMOUNT OF DAMAGE AWARD

(a) Percentage of Negligence of Thelonious Paige (from question 5)  35%

(b) Subtract: 100% - percent from (a) =  65%

(c) Damages to be awarded to Thelonious Paige: Multiply percent in (b) x Total Damages (from question 6) =  $3,180,474.19

END OF INTERROGATORIES. THANK YOU.

/s/ Charles Mood
FOREMAN

13 August 1996
DATE"

NORCOTT, J., with whom BERDON, J., joins, dissenting. I disagree with the majority's conclusion, and instead support the analysis and determination found in the original majority opinion of this court. *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 247 Conn. 24, 718 A.2d 425 (1998).[1]

I base my opinion on the application of certain fundamental principles central to the appellate review of a jury's verdict. It is well settled that the appropriate standard of review in a case such as this is "to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion. . . . *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988)." (Internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 242 Conn. 255, 277, 698 A.2d 838 (1997). The critical question in the resolution of this appeal is, therefore, whether there was sufficient evidence from which the jury reasonably could have inferred that an employee, agent, or servant of the defendant activated the boiler.

As was stated in the original majority opinion, "[w]e have consistently held that in a civil case proof of a

---

[1] The original majority opinion of this court was authored by Justice Berdon, who was joined by Justice Palmer and myself in affirming the judgment of the trial court.

material fact by inference from circumstantial evidence, alone, need not be so conclusive as to exclude every other hypothesis. . . . The decisive consideration is not whether the [fact so found] is consistent or inconsistent with another or other hypotheses but whether or not the inference upon which it is based was one which could have been *fairly and reasonably drawn* from the physical facts without the admixture of speculation or conjecture. . . . *Gleba* v. *New Britain*, 133 Conn. 85, 88, 48 A.2d 227 (1946)." (Emphasis in original; internal quotation marks omitted.) *Paige* v. *St. Andrew's Catholic Church Corp.*, supra, 247 Conn. 30. Moreover, "[t]riers of fact must often rely on circumstantial evidence and draw inferences from it. . . . There is no rule of law which forbids the resting of an inference on facts whose determination is the result of other inferences. . . . *Blados* v. *Blados*, [151 Conn. 391, 395, 198 A.2d 213 (1964)]." (Internal quotation marks omitted.) *Paige* v. *St. Andrew's Catholic Church Corp.*, supra, 32 n.9.

In the present case, direct evidence was not adduced at trial to show that any particular employee, agent or servant of the defendant activated the boiler, or was in the vicinity of the boiler room at the time of the plaintiff's accident. Nevertheless, the jury was provided with evidence related to the ability of many employees to activate the boilers, and their incentive to do so, in light of, first, the relatively cold outside temperature, and second, the insufficient instruction and supervision that church employees received concerning activation of the boilers while they were being cleaned. Admittedly, it is a close call whether there was sufficient evidence from which the jury reasonably could infer that it was an employee, agent, or servant of the defendant, rather than, for example, a parishioner or someone off the street, who activated the boiler. Consistent with the deferential standard by which we review conclusions of the jury, however, I cannot say that as a matter of

law, the jury lacked sufficient evidence from which it reasonably could have inferred that an employee, agent, or servant of the defendant activated the boiler, such that the judgment of the trial court should be reversed. I believe that by reaching that very conclusion, the majority today has invaded impermissibly the fundamental province of the jury.

Accordingly, I dissent.